RICHARD ROLANTI & another[1] *vs.* BOSTON EDISON
CORPORATION & another.[2]

No. 91-P-230.

Suffolk. May 19, 1992. - November 10, 1992.

Present: BROWN, FINE & GREENBERG, JJ.

*Practice, Civil*, Directed verdict, Judgment notwithstanding verdict, In-
structions to jury, Argument by counsel, Verdict, Special questions to
jury. *Negligence*, Utility pole, Comparative. *Police*, Injury on duty. *Ev-
idence*, Direct, Inference, Relevancy and materiality, Income from col-
lateral source. *Damages*, Tort, Apportionment. *Witness*, Unavailability.

In a personal injury case, there was insufficient evidence of negligence at-
tributable to one of the defendants and that defendant's motion for a
directed verdict should have been allowed [520-521], but there was suf-
ficient evidence from which an inference of negligence could be drawn
with respect to another defendant [521-522].

In an action seeking damages for personal injuries, there was no error in
the judge's refusal to give a certain requested instruction to the jury
regarding sick leave benefits the plaintiff had received, as that subject
was irrelevant to the plaintiff's injury and the defendant's liability.
[522-524]

Discussion of the "collateral source rule" and the admissibility in certain
circumstances of evidence that a personal injury plaintiff has received
income from a collateral source during any period of disability. [524-
525]

In the circumstances of a personal injury trial, there was no error in the
judge's refusal to give certain instructions to the jury, as requested by
the defendant, on the plaintiff's receipt of collateral income during the
time he was disabled [525-526], nor was there any error in the judge's
refusal to give a missing witness instruction with respect to a witness
who was apparently available to either side [526-527].

---

[1]Margaret Rolanti brought a loss of consortium claim.

[2]New England Telephone & Telegraph Company. As to the two
remaining defendants named in the original complaint, Selma Seligman
and Glenn Cunningham, the Rolantis settled their claims against Seligman
prior to trial for $20,000, and a separate judgment was entered pursuant
to Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974). The jury returned a
verdict in favor of Cunningham, and the Rolantis have not appealed from
the resulting judgment of dismissal on that claim.

Remarks by plaintiffs' counsel in his closing argument at a civil trial were
  not shown to be unfairly prejudicial, where the judge sustained the de-
  fendant's objections to counsel's comments and gave appropriate cura-
  tive instructions to the jury. [527-530]
The defendant in a civil trial waived any issue respecting the form of the
  special verdict by failing to request that certain issues be submitted to
  the jury by special verdict interrogatories. [530]
A personal injury case was remanded for a new trial on the issue of the
  apportionment of liability, where the judgment of liability of one of the
  two defendants was reversed on appeal so that the percentages of negli-
  gence did not then total 100% as required by G. L. c. 231, § 85. [530-
  533]

CIVIL ACTION commenced in the Superior Court Depart-
ment on February 17, 1984.

The case was tried before *John C. Cratsley*, J., and mo-
tions for a new trial were heard by him.

*Thomas D. Burns* for Boston Edison Corporation.

*James E. Caffrey* for New England Telephone & Tele-
graph Company.

*George C. McMahon* for the plaintiffs.

GREENBERG, J. Aggrieved by an adverse judgment
(founded on a jury verdict) concerning their joint efforts to
repair a fallen utility pole, the defendants, Boston Edison
Corporation (Edison) and New England Telephone and Tele-
graph Company (N.E.T.), argue that the trial judge mistak-
enly failed to allow their motions for directed verdicts and
for judgments notwithstanding the verdict on the ground that
there was insufficient evidence of any negligence. The de-
fendants also claim that the jury were unduly prejudiced by
opposing counsel's improper closing argument. Edison fur-
ther urges that it is entitled to a new trial because the judge's
instructions to the jury were flawed.

The plaintiffs' action seeks damages for an injury that the
plaintiff Richard Rolanti (Rolanti), a Needham police of-
ficer, sustained on February 22, 1983, while directing traffic.

On April 4, 1989, after seven days of trial, the case was
submitted to a jury on special questions, only one of which is
germane to this appeal. The jury compensated Richard with
an award of $90,000 in damages but awarded no compensa-

tion to his wife, Margaret Rolanti. After the judge denied the defendants' motions for a new trial, judgment was entered.[3]

We review the salient facts which the evidence allowed the jury to find. On February 22, 1983, about one and one-half hours before Rolanti was injured, Selma Seligman sneezed, momentarily lost control of her motor vehicle, and skidded off Great Plain Avenue in Needham into an adjacent utility pole. The impact severed the pole just above ground. Since it was anchored by several ground cables, the pole remained close to its original position. Apparently owing to the angle at which the pole precariously rested, however, there was slack in all of the attached wires which traversed the street. Two officers of the Needham police department were called for assistance. They diverted traffic to nearby side streets to allow access to the site for emergency service vehicles. Ten minutes later, after they reopened Great Plain Avenue, one of the officers, Linwood Hamilton, called his dispatcher and told him to notify Edison and N.E.T.

Edison overhead line supervisor Kevin Moore was stationed at Dedham when he heard a radio report of the event at about 3:20 P.M. He drove directly to the scene in his own car and arrived some ten minutes later. There, he determined that the pole was one for which N.E.T. had exclusive responsibility and asked an Edison dispatcher to call for a N.E.T. crew to replace it. Such a call was received by N.E.T. construction manager, Richard Graham, at 3:30 P.M. at the N.E.T. depot in Watertown. Within ten minutes a crew was assembled and began their trek from Watertown to Need-

---

[3]In response to the special questions (see Mass.R.Civ.P. 49, 365 Mass. 813 [1974]), the jury found that Edison, N.E.T., and Rolanti were negligent. The jury apportioned thirty-eight percent of the over-all negligence to Edison, thirty-eight percent to N.E.T., and twenty-four percent to Rolanti. The jury concluded that the parties' combined negligence was causally related to Rolanti's injury. As required by G. L. c. 231, § 85, the damages were diminished by a factor of twenty-four percent. The damages were further reduced to reflect the Seligman settlement (see note 2, *supra*). Judgment was entered in the amount of $48,400, plus interest, against N.E.T. and Edison.

ham in congested traffic, with a pole lashed on the service truck.

Graham drove ahead in his car. In the interim, just before the N.E.T. crew arrived at the accident site, Edison repair crews were already at work on power wires attached to the damaged pole, so that they could later be transferred to the new one. Rolanti, who relieved Officer Hamilton, assumed the task of directing traffic along Great Plain Avenue — its width narrowed by service vehicles parked along the side of the street. He stood beside an Edison repair truck, about three feet from the center line of the street, which was immediately adjacent to the damaged pole. Graham and his crew then arrived. It was 4:37 P.M. As Graham was parking his car in the space between the Edison repair truck and the broken pole, Rolanti faced Glenn Cunningham, who drove a tractor-trailer towards the site. Rolanti saw him approach and waved him to his right underneath the wires which sagged the least. As Cunningham's truck passed the pole, his trailer snagged one of the overhead wires — then, a "crackling" sound ominously filled the air as the pole toppled onto the parked Edison truck. Fortunately for Rolanti, a protective cage atop the cab of the truck absorbed the bulk of the force of the falling pole, but one of the cross-arms dealt him a glancing blow to the head.

Rolanti was treated at a hospital in Needham and released the following morning. On March 8, 1983, Dr. William L. Mason, his treating otolaryngologist, diagnosed a middle ear injury. Dr. Mason opined that this condition was causally related to the accident. He told the jury that "[t]he medical diagnosis was that of a perilymphatic fistula"; loosely translated: there was leakage of fluid from the injured structures of his inner ear which adversely affected his equilibrium.

Rolanti remained out of work for over two years. Examinations by two neurologists turned up different assessments of what organ was involved. He received sick leave benefits equal to his full regular salary from the town. Finally, in February of 1985, he became asymptomatic and by the following month had resumed all of his pre-accident activities.

1. *Denial of defendants' motions.* We turn first to the defendants' claim that it was error for the trial judge to deny their motions for directed verdicts and for judgments notwithstanding the verdict. In reviewing the denial of a directed verdict or a judgment notwithstanding the verdict, the question before us is the same: that is, whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff[s]." *Dobos* v. *Driscoll*, 404 Mass. 634, 656 (1989), quoting from *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). The court may not substitute its judgment of facts for that of the jury. *O'Shaughnessy* v. *Besse*, 7 Mass. App. Ct. 727, 728 (1979). Even with these limitations, we conclude that the judge should have granted the defendant N.E.T.'s motions.

In the present case, there was no evidence that the jointly owned utility pole was in a dangerous or defective condition prior to Seligman's collision. Nor was there any evidence for the jury to infer that N.E.T.'s response time — approximately one hour after notice of the accident was received — was less than reasonable. Contrast *Kelly* v. *Springfield*, 328 Mass. 16, 18 (1951). N.E.T.'s Graham testified that to complete the process of loading a new pole onto the carrier dolly ordinarily takes about thirty minutes. In this case, the operation went faster: both the pole and the crew were ready to travel in ten minutes. Graham further testified that the trip from the Watertown yard to the accident site in Needham took a little over half an hour and involved two trucks travelling during the height of the commuter rush hours. In an earlier fallen pole case, where the telephone company failed to remove or secure the hazard for three hours and where, as here, the initial accident was not caused by someone for whose conduct N.E.T. was responsible (see *White* v. *Mugar*, 280 Mass. 73 [1932]), it was held that there was insufficient evidence to warrant a finding of negligence on the part of the defendant. *Reidy* v. *New England Tel. & Tel. Co.*, 288 Mass. 46, 49 (1934). Another court has reached a similar result. Compare *Schmeling* v. *Ott*, 388 N.W.2d 195, 198

(Iowa Ct. App. 1986) (refusing to adopt "all due haste" standard to remedy dangerous conditions; applying instead "reasonable time" standard). Finally, even if N.E.T. had responded with more haste, Edison had not completed its portion of the work. The testimony of Edison's supervisor, Moore, that N.E.T. could not perform any work until the electric company's crews completed their tasks was uncontroverted.

In the present case, there was no evidence that the jointly owned utility pole was in a dangerous or defective condition prior to Seligman's collision. Nor was there any evidence for the jury to infer that N.E.T.'s response after the accident was less than reasonable. Contrast *Kelly* v. *Springfield*, 328 Mass. at 18. We therefore reverse the judgment against N.E.T.

The case against Edison presents a different question. Edison contends, and we think correctly, that the plaintiffs were unable to come up with any direct evidence that any member of the repair crew lowered the wires. Direct evidence has been described as evidence which, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Johansen* v. *NCR Comten, Inc.*, 30 Mass. App. Ct. 294, 299-300 (1991), quoting from *Randle* v. *LaSalle Telecommunications Inc.*, 876 F.2d 563, 569 (7th Cir. 1989). Rolanti attempted instead to show, first, that Edison had been working on the wires just before Cunningham arrived and, second, that trucks as large as Cunningham's had passed under the wires after Seligman's accident. Short of something so implausible as an Edison employee acknowledging that the wires were lowered just before Cunningham's trailer passed beneath (or being observed so doing by another), the process of the jury arriving at an ultimate finding of such negligence required their consideration of circumstantial evidence. So it was Rolanti, himself, who recalled that Edison's employees were "working on the pole or wires while [he] was directing traffic"; and Graham, in his testimony, noticed wires "lower than usual" on his arrival minutes before Rolanti was in-

jured; and, lastly, the driver of a vehicle immediately behind Cunningham stated that, just prior to the crack and sparking of the wires, Edison people were there.

An inference is an important means by which a party may satisfy his burden of persuasion sufficiently to transfer the burden of going forward to the other party, who may be in a better position to know certain facts essential to the case. *Bean* v. *Security Fur Storage Warehouse, Inc.*, 344 Mass. 674, 676 (1962). Facts, which as a matter of practicality are not subject to direct proof, may be proved through inference. See, e.g., *Marden* v. *Boston*, 155 Mass. 359, 360 (1892) (proof of death); *Conroy* v. *Fall River Herald News Pub. Co.*, 306 Mass. 488, 493 (1940) (proof of state of mind). See also *Duggan* v. *Bay State St. Ry.*, 230 Mass. 370 (1918).

Those cases, and others like them, ease the burden when, as here, the triers of fact must engage in a reasoning process which leads them to conclude the existence of an ultimate fact even though no direct evidence has been introduced. *Falden* v. *Crook*, 342 Mass. 173, 177 (1961). There was no error in the judge's denial of Edison's motions.

2. *Instructions as to Rolanti's duty.* Next, Edison argues that the judge committed reversible error by failing to give the jury its requested jury question no. 24, regarding the repayment of sick leave benefits Rolanti received from his employer. We reprint the requested instruction in the margin.[4]

Touching on this theme, counsel for the defendant Cunningham, on recross-examination of Margaret Rolanti, brought up, for the first time, the subject of her husband's weekly sick leave benefits.[5] The exchange between the two

---

[4] "24. You have heard evidence that Richard Rolanti continued to receive a weekly paycheck from the Town of Needham during the period in which he was on sick leave. These payments give the Town of Needham a lien, equal to the total amount of the payments, on any damages awarded to Mr. Rolanti. These payments are not, however, a loan. In other words, Mr. Rolanti does not have to repay the Town of Needham anything if he does not recover anything in this action." The judge essentially omitted the last sentence in the charge to the jury.

[5] General Laws c. 41, § 111F, as amended by St. 1977, c. 646, § 2, provides, in pertinent part, that: "Whenever a police officer . . . is incapacitated for duty because of injury sustained in the performance of his

demonstrated a lay person's general, but confused, under-
standing of the matter. She characterized the payments as a
loan, testifying that "[w]e had to pay that back." Asked to
clarify, she explained, "[y]es, sir, we have to pay back any-
thing my husband was paid for over the course that he was
injured." Rolanti provided similar testimony under cross-
examination.

Edison concedes that the judge repeated verbatim the first
two sentences of the requested instruction no. 24 but con-
tends that the judge should *also* have instructed the jury that
if, under G. L. c. 41, § 111F, Rolanti failed to recover in
his action, he "does not have to repay the Town of Needham
anything." See note 4, *supra.* By this omission, the argument
goes, the judge left the jury with the mistaken impression
that Rolanti needed an award to pay back an existing debt.
We will assume that request no. 24 fairly presented that the-
sis to the judge, but we conclude that the judge correctly
could have refused the entire request, let alone the com-
plained of portion. Here, the judge was unnecessarily gener-
ous in commenting at all on Edison's request.

It is well-settled that evidence that a plaintiff received
money from other sources during a period of incapacitation
is irrelevant. *Gray* v. *Boston Elev. Ry.*, 215 Mass. 143, 146
(1913). Such transactions were held long ago to have no
bearing on the extent of a plaintiff's injuries or the defend-
ant's liability for them. *Hayward* v. *Cain*, 105 Mass. 213
(1870). Recovery for impairment of earning capacity is not
affected by the fact that the injured person received pay-
ments under an insurance policy during the period of inca-
pacity or is paid in full wages under a contract of employ-
ment, since he is not being compensated for lost wages but
for impairment of earning capacity. *Shea* v. *Rettie*, 287
Mass. 454 (1934). In *Doherty* v. *Ruiz*, 302 Mass. 145, 146

---

duty . . . he shall be granted leave without loss of pay for the period of
such incapacity." Section 111F adds that, if a third party is liable for the
injury, any "sum recovered [from the third party] shall be for the benefit
of the . . . town . . . paying such compensation, unless the sum is greater
than the compensation paid . . . in which event the excess shall be . . .
paid to the person so injured."

(1939), Lummus, J., wrote "[o]ne who has lost no wages because his pay has been continued by his employer . . . as compensation for disability, may nevertheless recover damages for impairment of earning capacity."

We are not moved to a different conclusion by Edison's argument that the judge's refusal to explain to the jury the nuances of the lien provisions under the statute necessarily reinforced the plaintiffs' mistaken testimony concerning the repayment obligation. Further, it was not relevant to the principal damage question presented to the jury.

3. *Instructions as to mitigation of damages.* As often occurs in a trial of this sort, the defense tried to convince the jury that Rolanti voluntarily remained idle long after his recuperation in order to enhance his damage claim. There was some evidence adduced by the defendants that Rolanti's condition, as assessed by a consulting neurologist in March of 1983, was not as debilitating as described by his treating physicians. See *infra*, part 4.

Before we turn to the instructions that Edison wanted on the issue of mitigation of damages, reprinted in the margin,[6] we recapitulate what was, before the decision in *Corsetti* v. *Stone Co.*, 396 Mass. 1 (1985), the standard method of treatment of other payments received by an injured plaintiff — often referred to as the "collateral source rule."[7] Implicit

---

[6]The requested instructions read as follows:

"26. If you find that Richard Rolanti could have resumed working earlier than he did, then you should deduct from any determination of lost earnings or lost earning capacity *the amount of money which he could have made prior to actually returning to work*" (emphasis added).

"27. You may regard the evidence that Richard Rolanti continued to receive his regular salary as relevant to the issue of his motive for remaining out of work from February, 1983 to June, 1985."

The judge refused to give either instruction. The court's instructions to the jury on the calculation of damages began with the following statement: "The three categories of damages that you may consider for the plaintiff, Richard Rolanti, are as follows, fair and reasonable medical expenses, lost wages, and pain and suffering. I will describe each of those with a little more care." He then described each aspect in detail.

[7]See generally Schwartz, The Collateral-Source Rule, 41 B.U. L. Rev. 348, 349 (1961); Lambert, The Case for the Collateral Source Rule, 18 Fedn. of Ins. Counsel Q. 75, 76 (1962).

in the earlier cases was the assumption that the receipt of such income should not operate to reduce a plaintiff's damages. This assumption is no longer completely valid. In *McElwain* v. *Capotosto*, 332 Mass. 1 (1954), the Supreme Judicial Court ruled that evidence of a plaintiff being paid while out of work was admissible in the trial judge's discretion for the limited purpose of showing a plaintiff's motive for not returning earlier; that is, to impeach his credibility on the question whether the absence resulted from his injuries. In the subsequent case of *West* v. *Molders Foundry Co.*, 342 Mass. 8, 10 (1961), the court characterized this intrusion into the area of the "collateral source rule" as a "question of evidence on the issue of damages." But further exceptions to the operation of the rule as an exclusionary rule of evidence were allowed with great circumspection. In *Goldstein* v. *Gontarz*, 364 Mass. 800 (1974), the court commented that "jurors might be led by the irrelevancy to consider plaintiffs' claims unimportant or trivial or refuse plaintiffs' verdicts or reduce them, believing that otherwise there would be unjust double recovery." *Id.* at 809.

Then, with the decision in *Corsetti*, the court recognized another limited exception. Citing our decision in *Centola* v. *Driscoll*, 4 Mass. App. Ct. 817 (1976) (where we affirmed the admission of evidence of collateral source income where there was other evidence that suggested that the plaintiff was malingering), the Supreme Judicial Court held that evidence of collateral source income is admissible where "a plaintiff in a personal injury action has volunteered testimony as to penurious circumstances allegedly resulting from his injury." *Corsetti* v. *Stone Co.*, *supra* at 20. Should a plaintiff open the door by such a Micawberish appeal to the jury's sympathy, the *Corsetti* court left considerable deference to the trial judge to admit evidence of other sources of income that, in fact, did "turn up" during the period of the claimed disability.

Nothing of the kind occurred here. Testimony of Rolanti's treating physicians established that he was fully disabled for nearly two years by the inner ear injury sustained in the ac-

cident. Yet, no evidence was presented by any witness that suggested his continued absence from work resulted from circumstances unrelated to his disability. Furthermore, unlike the trial judge in *Corsetti*, the judge permitted extensive interrogation of both plaintiffs concerning the receipt of sick pay benefits and the amounts Mrs. Rolanti received from her occupation as a florist. He allowed Edison's counsel to comment adversely about Rolanti's long absence from work during his closing statement to the jury. As it turned out, the jury verdict was relatively modest. Edison could hardly maintain that, without the requested instructions, it was bereft of a basis to challenge Rolanti's credibility concerning the nature and extent of his damages. There was no error in this respect.

4. *The failure to call a witness instruction.* As part of the cross-examination by Edison's counsel of Rolanti's two principal treating physicians, the judge allowed defense counsel to introduce a medical report containing notes of Dr. Noseworthy, a neurologist who had seen Rolanti on one occasion shortly after the accident. This examination was at the behest of the town of Needham. His report contained Rolanti's statement that, by March 13, 1983, he felt eighty percent improved. The judge correctly admitted the report over Rolanti's timely objection registered on hearsay grounds — perhaps mindful that expressions made to a physician are admissible under our practice. See *Kramer* v. *John Hancock Mut. Life Ins. Co.*, 336 Mass. 465 (1957); *Uberto* v. *Kaufman*, 348 Mass. 171 (1964); Liacos, Massachusetts Evidence 346 (5th ed. 1981). Utilizing the report, defense counsel was also permitted to challenge Rolanti's treating physicians' diagnosis and opinion as to the likelihood of recurrence of the injury. No party called Dr. Noseworthy as a witness.

At the close of the evidence, Edison asked for the following instruction: "In light of Richard Rolanti's failure to call his initial treating neurologist, Dr. John Noseworthy, to the witness stand, you are permitted to infer that [his] testimony would have been adverse to the plaintiff." The judge refused to give this instruction, but allowed defense counsel's exten-

sive questioning of Rolanti's physicians regarding Dr. Noseworthy's assessment during the trial.[8] He also permitted comments in the closing arguments on the point. There was no error. See *Spiller v. Metropolitan Transit Authy.*, 348 Mass. 576 (1965) (where plaintiff's counsel had an opportunity to comment on failure of opposing party to place his witness in the courtroom on the stand, plaintiff's motion for a new trial was properly denied). Furthermore, nothing in the record in this case suggests that Dr. Noseworthy was not equally available to Edison, in which case the judge, in his discretion, might have excluded the line of questioning altogether. See *Grady v. Collins Transp. Co.*, 341 Mass. 502, 506 (1960). Again, Edison has no cause to complain because of the judge's election not to bolster a questionable point by including the requested instruction in his charge to the jury.

5. *The plaintiffs' closing argument.* In his closing remarks to the jury, the plaintiffs' counsel departed from his script and launched into a somewhat rambling, point by point, refutation of the infirmities counsel found in the defendants' arguments. To appreciate the tenor of what followed, we quote some brief excerpts in the margin.[9] Edison objected to these comments and characterized them as expressions of personal beliefs and opinions. The judge sustained these ob-

---

[8] As we noted, *supra*, Dr. Noseworthy was not, in fact, Rolanti's initial treating neurologist but was hired by the town of Needham to evaluate Rolanti's condition in March of 1983.

[9] On the issue of what effect, if any, the jury should give to Dr. Noseworthy's report, counsel commented:

"And, you know, one question I ask myself, you know — and, you know, it is like the infamous Doctor Noseworthy. I'm the one, by the way, that asked you to look at his letter. I am the one that moved that into evidence. I've been moving everything into evidence here, because I'm not trying to hide anything, and neither is Officer Rolanti. Okay? And I'm not suggesting that my brothers are. We are doing our job for our clients. But I want you to look at all of the facts."

As to the alleged hazard Rolanti encountered, counsel stated to the jury:

"I'll tell you, I was a little frightened when I heard that; because I drive around and there's telephone poles all around me when I drive. But I'd like to think that these people would be able to get there if something happens. But I don't want to dwell on

jections and cautioned counsel "against injecting [him]self personally into the closing argument." The judge, however, did not agree to reprimand the plaintiffs' counsel before the jury.

Counsel for the plaintiffs also rendered a confused version of his theory of liability against Edison in the closing by his suggestion that the problem might have been caused not by the wires, but by Edison's handling of the pole. He suggested that the jury "might draw the inference that maybe the pole came down on its own weight or maybe the Edison people lowered it. No one warned him of that. Okay?"

At that point, Edison's counsel objected and requested a mistrial or a curative instruction. In response, the judge interrupted the summation and informed the jury in no uncertain terms that, "when I begin my instructions, you will hear me remind you that it is your memory of who said what which controls and leaves you to make the factual determinations." He added that "[t]here have been some very appropriately healthy arguments here this morning about having different memories about who said what when the witnesses testified under oath."

---

that."

And on the question of defense counsels' submission to the jury that Rolanti was a malingerer, the plaintiffs' counsel countered with the following:

"If you listened to Mr. Rolanti's answers, I don't think you're going to find that he was trying to slack off here. I don't think that you could — well, it is up to you — but you could draw an inference that he was a lazy person and he enjoyed staying out of work for two and a half years. . . . I don't think there — and, again, it is your opinion — that there has been evidence that he enjoyed this period of time."

See Mauet, Fundamentals of Trial Techniques, at 276 (2d ed. 1988). "Argue your strengths, not your opponent's weaknesses. Successful arguments are those that have a positive approach and concentrate on the evidence produced at a trial that affirmatively demonstrates your party should prevail. Jurors soon realize that arguing extensively your opponent's weaknesses occurs only when you have little good to say about your own case; negative arguments often create negative impressions and should be avoided."

It is well established under our practice that a trial judge must take "rigorous and emphatic action" to counteract prejudicial statements made in front of the jury. See *Goldstein* v. *Gontarz*, 364 Mass. 800, 811 (1974), citing *London* v. *Bay State St. Ry.*, 231 Mass. 480 (1919); *Harlow* v. *Chin*, 405 Mass. 697, 703-706 (1989). Although a trial judge is duty bound to cure improper remarks, whether a mistrial should be declared remains discretionary. See, e.g., *Fialkow* v. *DeVoe Motors, Inc.*, 359 Mass. 569, 571-572 (1971). The trial judge has substantial latitude to determine the stage when a mistrial should be declared, as distinct from interceding with a curative instruction. A judge may stop counsel at the moment of the impropriety or confront the matter later in the course of charging the jury. The precise wording of a curative instruction must be left to the trial judge's discretion. *Salter* v. *Leventhal*, 337 Mass. 679, 697-698 (1958). *Pemberton* v. *Boas*, 13 Mass. App. Ct. 1015, 1017-1018 (1982).

The judge in the instant case followed established precedent by giving general curative instructions in response to the plaintiffs' counsel's inappropriate remarks. During the course of his charge, the trial judge reminded the jury several times that closing arguments are not evidence. Edison contends that the judge was overindulgent and that his instructions here were not "strong[ly] curative," citing a criminal case, *Commonwealth* v. *Gallego*, 27 Mass. App. Ct. 714, 720 (1989). In civil cases, we have found few instances where a new trial was granted because of an overreaching closing argument. See *London* v. *Bay State St. Ry.*, 231 Mass. at 485; *Leone* v. *Duran*, 363 Mass. 1, 18-19 (1973) (partially vacated on other grounds). Both cases found that the offending remarks crossed the boundary when counsel's statements became an overt appeal to the jury's partiality and prejudice. This case was rigorously defended and argued by defense counsel. As was said in *Fialkow* v. *DeVoe Motors Inc.*, 359 Mass. at 571, "[i]t would add nothing to our jurisprudence to try and determine which lawyer tossed the first irrelevant barb, which was the abuser and which was the abused. . . ."

We are loath to say that the challenged remarks, in the setting of the trial, were unfairly prejudicial. Further, the judge instructed the jury to "[d]ecide the case on the evidence and the evidence, alone."

Finally, we note that the plaintiffs' counsel's expressions of personal opinion did not constitute reversible error because the judge aptly gave prompt curative instructions, and Edison did not complain on that account until after the jury returned a verdict. See *In-Towne Restaurant Corp.* v. *Aetna Cas. & Sur. Co.*, 9 Mass. App. Ct. 534, 544-545 (1980).

6. *The form of the special verdict.* Lastly, Edison argues it is entitled to a new trial because the judge, during the course of the trial, permitted the jury to consider evidence of more than one theory of liability; negligent handling of the wires, negligent failure to warn, and negligent failure to clear the area. Before submission of the case to the jury, and by agreement of all counsel, the judge drafted special questions on negligence for the jury's consideration. The thrust of Edison's contention, raised only after the trial, is that the judge should have framed separate questions on each theory of negligence. Because pursuant to Mass.R.Civ.P. 49(a), 365 Mass. 813 (1974), failure to ask that an issue be submitted to the jury by a special verdict interrogatory constitutes a waiver of jury trial on the issue or issues omitted, we need not consider the point. See *Hawco* v. *Massachusetts Bay Transp. Authy.*, 398 Mass. 1006 (1986), and authorities cited.[10]

7. *Conclusion.* Because we reverse the judgment against N.E.T., the percentages of negligence do not, as required by G. L. c. 231, § 85, total 100%. We can find no Massachusetts case where this circumstance has arisen at the appellate level. Two possible alternatives are suggested by the very few

---

[10]Edison makes various other arguments, including claims based on the judge's failure to instruct the jury that Rolanti's sick leave benefits were not taxable and that the judge erred in letting Dr. Mason testify concerning the possibility of Rolanti's injury recurring, in a sequence in which Edison says its motion for a new trial should have been allowed. There was no abuse of discretion. See *Galvin* v. *Welsh Mfg. Co.*, 382 Mass. 340, 343 (1981).

cases which have dealt with this problem. In *Turnbull* v. *Byram*, 235 Kan. 891 (1984), a new trial was required because that court concluded, in similar circumstances as pertain here, that it could not be assumed that the jury would have assigned the same relative negligence if they had originally been presented with the two remaining parties. When a reviewing court finds that the trial judge should have directed a verdict as to one defendant, that defendant's assigned negligence is "left dangling" and must be reassessed at a new trial. *Id.* at 897.

The other possibility is for this court to assume that merely because N.E.T. cannot be found on the evidence to be negligent does not imply or suggest that the jury, if they had been assigned the task of apportioning negligence between the two remaining parties, would have reached a different verdict as to the relative negligence of Rolanti and Edison. Arguably, the interest of judicial economy would be best served by this approach, and it could be accomplished by assuming that the combined negligence of Rolanti and the defendant Edison amounted to 100%. We could then apply a mathematical formulation attributing to each of them a percentage reflecting their related causal negligence as found by the jury.[11]

In States — such as Massachusetts — that have adopted modified comparative negligence statutes, judges may rule as matter of law by the allowance of a motion for directed verdict that the plaintiff was more than fifty percent liable.

---

[11]Assigning the same relative negligence to the remaining parties would alter the percentage of damages for which the parties are responsible. In this case, Edison would be liable for sixty-one percent of the jury's award, as opposed to thirty-eight percent of the award when N.E.T. was still a party to the case. Similarly, Rolanti's negligence would increase from twenty-four to thirty-nine percent.

The exact computation is arrived at by multiplying the respective percentage figures, which total sixty-two percent, by 1.613, which reflects the ratio between 100 percent and sixty-two percent (100 divided by 62 = 1.613). Thus the negligence of the plaintiff found by the jury to be twenty-four percent would be restated as thirty-nine percent (24 x 1.613 = 38.712), and the negligence of Edison found by the jury to be thirty-eight percent would be restated as sixty-one percent (38 x 1.613 = 61.294).

Bender, Comparative Negligence § 15.20[2] (1989). In these instances, the plaintiff is precluded from recovering any damages. Similarly, judges may rule that the plaintiff was not negligent and permit the plaintiff to recover 100% of the award of damages. Alternatively, where the court finds that the judgment is against the weight of the evidence, the judge may order a new trial. In this situation the judge is not making precise determinations as to proportional liability. If this court proportionally adjusted the remaining parties' negligence, it would be making such a determination. Further, as in *Turnbull* v. *Byram*, *supra*,[12] a plaintiff who would have recovered prior to the court's removal of one of the defendants may not always be able to recover any damages after the court's action.[13]

We are constrained to remand the case for a new trial to resolve the issue of apportionment of liability. As in *Flood* v. *Southland Corp.*, *ante* 287, 302 (1992), the total amount of damages found by the jury shall stand. The judgment against N.E.T. is reversed, and judgment shall enter dismissing the case against N.E.T. The judgment against Edison is vacated, and the case is remanded to the Superior Court for a new

---

[12]In *Turnbull*, the jury found the plaintiff forty-eight percent negligent, one defendant seventeen percent negligent, and the other defendant thirty-five percent negligent. On appeal, the thirty-five percent negligent defendant was held not to be negligent at all as matter of law. If the court had sought to keep the relative negligence between the two parties remaining in the case the same, the plaintiff's negligence would have been seventy-four percent and the defendant's negligence would have been twenty-six percent. In these circumstances, where the plaintiff's negligence is greater than the defendant's negligence, the plaintiff would have been precluded from recovering any damages. See 235 Kan. at 879.

[13]Similar issues arise in cases where one defendant has settled a claim with the plaintiff prior to trial. See *Laveck* v. *Pascoe Pizza, Inc.*, 29 Mass. App. Ct. at 938 n.6. Massachusetts has not yet addressed the issue of whether a jury should assess the negligence of a defendant who has settled. *Ibid.* Trial judges have both included and excluded such defendants from the jury's purview. This court has acknowledged the importance of the point and noted that, if the trial court wrongly decides the issue, it would be grounds for ordering a new trial. *Id.* at 936.

trial as to Edison and Rolanti for a redetermination of liability.

*So ordered.*