## COMMONWEALTH *vs.* SANDRA DOSTIE.

Hampshire. March 4, 1997. - July 10, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, FRIED, & MARSHALL, JJ.

*Practice, Criminal,* Instructions to jury, Capital case. *Evidence,* Inference.

At the trial of an indictment for murder in the first degree, there was no error in the judge's instructions to the jury on the use of inferences and, therefore, the instructions created no substantial likelihood of a miscarriage of justice. [374-377]

INDICTMENT found and returned in the Superior Court Department on September 7, 1994.

The case was tried before *Constance M. Sweeney,* J.

*Charles K. Stephenson* for the defendant.

*Judith Ellen Pietras,* Assistant District Attorney, for the Commonwealth.

MARSHALL, J. A Hampshire County jury found the defendant, Sandra Dostie, guilty of murder in the first degree of her five year old stepson, Eric Dostie, by reason of deliberate premeditation. On appeal, the defendant argues that, because the Commonwealth's case rested exclusively on circumstantial evidence, the judge's instructions on the law governing inferences created a substantial likelihood of a miscarriage of justice. The defendant also asks that we reduce the verdict pursuant to G. L. c. 278, § 33E. We conclude that the judge properly instructed the jury on the law governing inferences, and that there is no basis to exercise our power under G. L. c. 278, § 33E, to reduce the verdict. We affirm the judgment.

1. We summarize the facts as the jurors could have found them, in the light most favorable to the Commonwealth. *Commonwealth v. Sanna,* 424 Mass. 92, 93 (1997). The victim was the son of Steven Dostie, the defendant's husband at the time of the killing, and of his former wife. The victim's natural parents were separated in 1990; in accordance with their subsequent divorce

agreement Eric remained in his mother's custody, he visited his father two days a week, and Steven Dostie was required to pay his former wife $175 each week for child support. At the time of the murder the defendant and Steven Dostie had one child, Emily, who was born in November, 1993.[1]

On August 27, 1994, Eric was spending the weekend with his father and the defendant. Steven Dostie left for work early that morning and returned home at approximately 4 P.M. On his return from work he noticed his son lying on the living room floor with a couch pillow over his face, apparently asleep. The television was on, the living room windows were open, and the sliding door to the rear deck off of the kitchen was open. After calling out, "Hello," he heard a sound from the cellar; he opened the cellar door and, hearing a muffled scream, ran downstairs. There he found the defendant sitting on the floor with her back against a support column, her wrists and head bound with duct tape. She was upset and sweaty. When he removed the tape from her mouth, she said, "Two guys came in, check the kids."

Returning upstairs, Steven Dostie removed the pillow from Eric's face, and saw that his eyes were open and his lips purple. After checking on Emily, who was not injured, he saw the defendant kneeling beside Eric performing cardiopulmonary resuscitation (CPR). Steven Dostie telephoned for help; two officers arrived shortly thereafter and began CPR on Eric. Additional officers and medical personnel arrived and later transported Eric to a local hospital, where he was pronounced dead shortly after 7 P.M. The defendant was questioned briefly by three different officers on the afternoon of the killing.[2]

Later that day the defendant went to the Easthampton police station and provided the police with a five-page statement about the incident. She told the police that she and Eric had been playing a board game for approximately fifteen minutes before

---

[1] In August, 1994, the defendant was pregnant with a second child; she subsequently gave birth to Timothy Dostie on April 25, 1995.

[2] The defendant gave inconsistent accounts of how she was brought into the cellar and bound with duct tape. She also told the police that at approximately 2:30 P.M., two men wearing nylon stocking masks entered the house through the kitchen, and one of them forced her down the cellar stairs. She said she overheard one of them ask, "What about the baby?" and the other respond, "No, only the boy."

the intruders arrived.[3] The defendant said she screamed, one of the men covered her mouth, pushed her down the cellar stairs, and then bound and gagged her with the duct tape. At trial, the prosecutor introduced evidence that suggested that only the defendant and Steven Dostie had been in the cellar, that the tape had been applied in a way to cause the least discomfort to the defendant, and that the visible injuries on the defendant were not consistent with her statement to the police.

The medical examiner testified that an autopsy of Eric revealed that the only marks on his body were made during the resuscitation efforts. His nailbeds were deep purple, and there were petechial hemorrhages in the lungs and heart, conditions that are consistent with asphyxia, or death due to a lack of oxygen. He concluded that the cause of Eric's death was asphyxia, which includes smothering, and that children who are smothered often do not exhibit any sign of physical injury.

The Commonwealth presented evidence to establish a motive for the defendant to kill her stepson. Steven Dostie testified that the defendant expressed concern that he spent too much time with his son, taking time away from her, and she complained about the child support payments he was required to make to his former wife. A long-time friend of the defendant testified that on June 18 she had a lengthy telephone conversation with the defendant during which the defendant expressed her frustration and anger at the situation with her stepson, said that the child support payments were a substantial financial burden on the family, that she was often required to care for her stepson while her husband was at work, and that she could "do something and no one would find out."

2. The defendant argues that the judge's instructions on the use of inferences was improper. She asserts that in a criminal prosecution, every inference must be based on an independently proven fact, and may never be based on another inference. To permit otherwise, she says, leaves a jury free to premise their verdict on speculative inferences, thereby reducing the Commonwealth's burden of proof. Because the defendant failed to object to the jury instructions, we review the charge for an error which creates a substantial likelihood of a miscarriage of justice. See

---

[3] At trial a witness for the Commonwealth testified that certain game pieces, "jewels," which were central to the playing of the game, were still in the box; for a game in progress, the pieces would be on the board.

*Commonwealth* v. *Grant*, 418 Mass. 76, 84-85 (1994); *Commonwealth* v. *Skinner*, 408 Mass. 88, 92 (1990). We conclude that there was no error in the instructions to the jury, and therefore, obviously no substantial likelihood of a miscarriage of justice.[4]

Probative evidence takes two forms: direct and circumstantial evidence. Direct evidence asserts or demonstrates the fact for which it is offered and "if believed . . . will prove the particular fact in question without reliance upon inference or presumption." P.J. Liacos, Massachusetts Evidence § 4.2, at 118 (6th ed. 1994), quoting *Rolanti* v. *Boston Edison Corp.*, 33 Mass. App. Ct. 516, 521 (1992). Circumstantial evidence requires "the trier [of fact] to make inferences to reach the fact proposition." *Id.*, citing *Abraham* v. *Woburn*, 383 Mass. 724, 730 (1981). There is no difference in probative value between direct and circumstantial evidence. *Commonwealth* v. *Corriveau*, 396 Mass. 319, 339 (1985).[5] In criminal prosecutions, circumstantial evidence is competent to establish guilt beyond a reasonable doubt. See *Commonwealth* v. *Cohen*, 412 Mass. 375, 380 (1992); *Commonwealth* v. *Nadworny*, 396 Mass. 342, 354 (1985), cert. denied, 477 U.S. 904 (1986).

In cases where circumstantial evidence is introduced, we have never required that *every* inference be premised on an indepen-

---

[4]The defendant also suggests that, during her closing argument, the prosecutor invited the jury to make an improper inference based on speculation. The prosecutor had argued, "[b]ut [the defendant] said, 'I have a way of doing it that no one will ever find out.' [The defendant] is a nurse. And she knew a way. And she knew if she smothered [the victim], there would be no signs." This error, the defendant argues, in conjunction with the judge's instructions on inferences and other circumstances of the trial, gave rise to a substantial likelihood of a miscarriage of justice. We disagree. The Commonwealth is entitled to argue inferences that may reasonably be drawn from the evidence. *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987). There was evidence that the smothering of a five year old child is usually accompanied by no signs of physical injury, and it was not unreasonable for the prosecutor to draw the inference that a medical professional such as the defendant would know this. Even if the prosecutor's argument were improper in this single respect, "we must and do recognize that closing argument is identified as argument, the jury understands that, instructions from the judge inform the jury that closing argument is not evidence, and instructions may mitigate any prejudice in the final argument." *Id.* at 517. We are satisfied that in this case the judge's instructions served as a sufficient prophylactic against the jury's making improper speculative inferences.

[5]"Circumstantial evidence . . . although 'indirect,' . . . can carry persuasive value equal to or even greater than that of direct proof." P.J. Liacos, Massachusetts Evidence § 4.2, at 119 (6th ed. 1994).

dently proven fact; rather, we have permitted, in carefully defined circumstances, a jury to make an inference based on an inference to come to a conclusion of guilt or innocence. See *Commonwealth* v. *Schand*, 420 Mass. 783, 795 n.12 (1995).[6] But we require that each inference must be a reasonable and logical conclusion from the prior inference; we have made clear that a jury may not use conjecture or guesswork to choose between alternative inferences. See *Commonwealth* v. *Schand*, *supra* at 795 n.12[7]; *Brown* v. *Commonwealth*, 407 Mass. 84, 89 (1990), *S.C.*, 414 Mass. 123 (1993) (inferences drawn from circumstantial evidence need not be necessary inferences, but only "reasonable and possible"); *Commonwealth* v. *Ferguson*, 384 Mass. 13, 19 (1981) ("In choosing among the many possible inferences from the evidence presented in this case, the jury would necessarily have had to employ conjecture. A conviction based upon evidence tending equally to support alternative propositions, some tending to demonstrate innocence and others tending to show guilt, cannot stand"). We have prohibited the drawing of speculative inferences, but have not otherwise prohibited the drawing of one inference based on another inference. See, e.g., *Commonwealth* v. *Armand*, 411 Mass. 167, 170-171 (1991) (conviction based on inference reversed where we concluded it was "speculative on the evidence" whether the defendant had the requisite mens rea); *Commonwealth* v. *Ferguson*, *supra* at 18-19 (conviction reversed where limited evidence gave rise to many

---

[6]"If there were [no such rule], hardly a single trial could be adequately prosecuted. For example, on a charge of murder the defendant's gun is found discharged. From this we infer that he discharged it, and from this we infer that it was his bullet that struck and killed the deceased. Or the defendant is shown to have been sharpening a knife. From this we argue that he had a design to use it upon the deceased, and from this we argue that the fatal stab was the result of this design. In these and innumerable daily instances we build up inference upon inference, and yet no court (until in very modern times) ever thought of forbidding it. All departments of reasoning, all scientific work, every day's life and every day's trials proceed upon such data." 1A J. Wigmore, Evidence § 41 (1983).

[7]In *Commonwealth* v. *Schand*, 420 Mass. 783, 795 n.12 (1995), we found acceptable jury instructions similar to those used here: "[Y]ou may draw reasonable inferences in connection with the evidence that you believe in this case, but you should not pile inference upon inference until the pile gets so high that it tips over logically or that the chain 'gets so weak that it doesn't hold together any more. So make sure that when you run through your inferences, you check the starting point and the ending point to make sure that they are still reasonable."

possible inferences, requiring jury to employ conjecture to choose among them); *Commonwealth* v. *Schand, supra.* In this case the judge correctly instructed the jury that they should not use guesswork, and that if any inference could lead to alternative conclusions of guilt or innocence, they must favor innocence. The jurors were not left free to premise their verdict on speculative inferences, and nothing in this record suggests that the jury did so.

Nor did the judge's instructions on inferences improperly lower the Commonwealth's burden of proof, as the defendant suggests. "There is no requirement that . . . each inference made must be proved beyond a reasonable doubt." *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 309 (1992). "Every necessary element of the crime must be proved beyond reasonable doubt, but it does not follow that every piece of evidence must be admissible beyond a reasonable doubt." *Commonwealth* v. *Polian*, 288 Mass. 494, 498 (1934). We conclude that there was no error in the judge's instructions and no error leading to a substantial likelihood of a miscarriage of justice.

3. We have considered the record as a whole and find no reason to exercise our power under G. L. c. 278, § 33E, either to order a new trial or to reduce the verdict to murder in the second degree.

*Judgment affirmed.*