DAVID GOLDBAUM vs. WILLIAM WEISS.

No. 98-P-1809.

Suffolk. September 18, 2000. - December 1, 2000.

Present: JACOBS, KAPLAN, & SMITH, JJ.

*Contract,* Performance and breach, Interference with contractual relations. *Consumer Protection Act,* Unfair or deceptive act, Damages. *Limitations, Statute of. Practice, Civil,* Directed verdict, Judgment notwithstanding verdict.

On a claim for unfair and deceptive practice in violation of G. L. c. 93A, § 11, arising out of intentional interference with an advantageous business relationship, the judge correctly denied the defendant's motions for directed verdict and for judgment notwithstanding the verdict [557-559], and the defendant did not properly preserve any objection to the damages awarded [559].

CIVIL ACTION commenced in the Superior Court Department on March 24, 1994.

The case was tried before *Elizabeth B. Donovan,* J.

*Mark W. Corner* for the defendant.

*Michael B. Feinman* for the plaintiff.

KAPLAN, J. In brief outline, the evidence in this case ran thus. The plaintiff David Goldbaum operated the Café Stella offering Italian ice creams and coffees in leased premises in the Marketplace Center building in the Quincy Market area of Boston. The plaintiff met the defendant Jan Marshall[1] who, together with the defendant William Weiss, owned J.M. Boston Associates, Inc. (JMB), the franchisee of a Boston Chicken, Inc. (Boston Chicken),[2] outlet on Boylston Street, and later a second outlet on Massachusetts Avenue, Boston. (Weiss resided in New York, but was in regular communication with Marshall in Boston.) Goldbaum and Marshall talked about JMB furnishing

---

[1]Marshall has not appealed from the judgment.

[2]Formerly known as New Boston Chicken, Inc.

chicken and other products to Café Stella; then about Goldbaum's surrendering his lease (on which he was delinquent in his rent payments) and having JMB come in with a Boston Chicken outlet there, Goldbaum receiving compensation for his withdrawal. Neither idea proved mutually acceptable, and on February 5, 1991, Goldbaum wrote to Marshall definitely calling quits.

On the same date, February 5, Goldbaum went to see George Naddaf, a power at Boston Chicken. They discussed Goldbaum's applying for an option for himself to acquire a franchise for the café premises. On February 15, Goldbaum bought an option on the franchise, paying the stated fee of $10,000 (raised from his private funds from an IRA account).

When Marshall and Weiss learned of Goldbaum's option, they were both "unhappy" and they let Naddaf know they were. By this date they had power of persuasion: through JMB they were running the two franchises above mentioned, which had become the flagships, the most successful of the twelve or more Boston Chicken franchises then extant. Naddaf knew that Marshall and Weiss were interested in a franchise location in downtown Boston and expected to be told about or have "first dibs" on an opportunity around Quincy Market.

Hard upon Marshall and Weiss's protest, Naddaf invited Goldbaum to headquarters on February 21. Sometime between February 5 and 21 Marshall had rejected flatly the idea of a "partnership" for the café spot, but Naddaf now encouraged the idea: Goldbaum, he noted, had the location (in fact it was merely 600 square feet) and Weiss (or Marshall and Weiss) the money. Naddaf introduced Goldbaum to Weiss on the telephone and they spoke of forming a corporation to acquire a franchise with Goldbaum, Marshall, and Weiss in effect sharing equally in the profits and Goldbaum receiving a yearly amount for his services as manager. An undated note by Goldbaum set out his understanding of the scheme discussed.

On February 27, 1991, Goldbaum entered upon a training program for intending franchise operators, which he duly completed. Now began a welter of document drafting by counsel retained by Goldbaum and Marshall (some reproduced in the voluminous record herein), and talks went on to settle points in the relations inter se of Goldbaum, Marshall, and Weiss; to fix the terms of the franchise besides the boilerplate; and to arrange the provisions of the lease to the proposed "subchapter S"

corporation under the Internal Revenue Code, which was to supersede Goldbaum's lease. Goldbaum called for a "closing" on June 13, 1991, upon documents in the form available at the time, and again for a closing on June 21, but Marshall did not respond. After warning by letter of June 19, Goldbaum declared the entire affair dead by letter of June 26.

Goldbaum commenced the present action in Superior Court on March 24, 1994, naming Marshall, Weiss, Naddaf, and Boston Chicken as defendants. The latter two were voluntarily dismissed from the action (in July, 1995). After trial, to be summed up *infra*, judgment entered on a claim for unfair or deceptive practice under G. L. c. 93A, § 11, against Marshall and Weiss. Weiss appeals; Marshall did not notice an appeal.

1. The plaintiff's theories of his case were the following (as summarized in his counsel's closing argument to the jury). First alternative: there was in substance an enforceable contract between the plaintiff Goldbaum on one side and the defendants Marshall and Weiss on the other by which the three, through a subchapter S corporation, were to open and operate a Boston Chicken franchise at the café location; the defendants committed a breach of the contract by refusing to "close" and should be held liable for the breach. Second alternative: the plaintiff had an advantageous business opportunity represented by his paid-for franchise option secured on February 15, 1991, on which he proposed to go forward alone. The defendants intentionally interfered with this prospect by putting pressure on Naddaf, resulting in Naddaf's recommending a three-way "partnership." The defendants acquiesced in the proposition, played along with it, and then dropped it. They never intended to carry through. The defendant Marshall, in particular, acted a duplicitous part. The plaintiff was led during this period to abandon any efforts to pursue his franchise option on his own behalf.[3] All this encompassed a c. 93A, § 11, violation. See *Greenstein* v. *Flatley*, 19 Mass. App. Ct. 351, 356 (1985).

2. The case was submitted to the jury on special questions, and their answers came in substance to the following. There was no perfected, enforceable contract among the three (Questions 1, 2). (Indeed, as one reads the record, there were material matters still outstanding, not agreed to, when the defendant

---

[3]After June 26, 1991, Goldbaum tried to find a way with one Dan Posternak to exercise the option, but the effort failed, and the option expired in 1992.

Marshall failed to respond to either of the "closings.") Each of the defendants did interfere intentionally with the plaintiff's business relationship with Boston Chicken (Questions 7, 8). To Question 13, when did the plaintiff's claim on this ground mature, the jury answered "February, 1991." (The instant action was commenced by the filing of the complaint on March 24, 1994. Thus the interference claim was time barred by the three-year statute of limitations for torts, G. L. c. 260, § 2A.) The defendants did commit an unfair or deceptive practice, wilfully or knowingly,[4] aggravated in the case of the defendant Marshall by his false representation in the sense of pretending sincerity while in fact never intending to consummate the "partnership" plan (Questions 11, 12, 5, 6). (The proof sufficient to establish interference with advantageous relations was enhanced here by proof of unfair or deceptive practices, as the jury found, so as to bring the case within G. L. c. 93A, § 11. Note, e.g., Marshall's activities, and see *Piccicuto* v. *Dwyer*, 32 Mass. App. Ct. 137, 138-139 [1992]; *Cherick Distributors, Inc.* v. *Polar Corp.*, 41 Mass. App. Ct. 125, 128 [1996]. See also *Walsh* v. *Chestnut Hill Bank & Trust Co.*, 414 Mass. 283, 288 [1993]; *Massachusetts Employers Ins. Exchange* v. *Propac-Mass., Inc.*, 420 Mass. 39, 43 [1995]; *Meyer* v. *Wagner*, 429 Mass. 410, 423-424 [1999]; *Madan* v. *Royal Indem. Co.*, 26 Mass. App. Ct. 756, 762 [1989]. The § 11 claim survived as it has a limitations period of four years, G. L. c. 260, § 5A.)

3. The trial judge denied the defendants' motions for a directed verdict at the close of all the evidence,[5] and then denied postverdict motions, and renewed motions, for judgment notwithstanding the verdict. The judge wrote a "Memorandum of Decision and Order on Post Trial Motions," in which she found no ground to overturn the jury's findings, and she denied the motions. The judge was evidently letting the jury find the facts for the breach of contract and interference claims, with the latter basing the unfair practices claim and ultimately serving as

---

[4]Weiss asked the judge to put the question about unfair practices separately as to Marshall and himself but did not persist in the request.

[5]There is now some complaint by the plaintiff that the motions did not specify grounds (apart from a reference to the limitations period) — see Mass. R.Civ.P. 50(a), 365 Mass. 814 (1974) ("A motion for a directed verdict shall state the specific grounds therefor") — but no objection on this score was taken at the time. See *Soares* v. *Lakeville Baseball Camp., Inc.*, 369 Mass. 974, 975 (1976); *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 9 n.3 (1983).

"the underpinning for the 93A claims against both defendants," as the judge ruled. The judge, we note, was not treating the jury's verdict on the special questions as a nonbinding advisory verdict. For the judge's permitted choice of procedure in the trial of a c. 93A claim, see *Whitehall Co.* v. *Barletta,* 404 Mass. 497, 499-500 & n.6, 504 (1989); *Acushnet Fed. Credit Union* v. *Roderick,* 26 Mass. App. Ct. 604, 606 (1988); *Chamberlayne Sch. & Chamberlayne Junior College* v. *Banker,* 30 Mass. App. Ct. 346, 354 (1991); *W. Oliver Tripp Co.* v. *American Hoechst Corp.,* 34 Mass. App. Ct. 744, 753 (1993); *Wyler* v. *Bonnell Motors, Inc.,* 35 Mass. App. Ct. 563, 566 (1993).

4. On the record made, the judge's holding is supported. The defendants in their motions for judgment n.o.v. tried to avert this result by invoking the proposition that certain relationships, including a relationship of partnership or joint venture, may in varying circumstances be characterized as "private," i.e., not in an arm's length or competitive mode, and thus considered outside the bounds of § 11. See *Linkage Corp.* v. *Trustees of Boston Univ.,* 425 Mass. 1, 23 n.33, cert. denied, 522 U.S. 1015 (1997); Gilleran, The Law of Chapter 93A § 2.18 (1989 & Supp. 1999). If this proposition were supposed to apply to the instant facts, then the common law breaches that may have occurred between the parties to the relationship could be treated on their own terms without reference to § 11. But then the three-year statute of limitations would be reinstated and applied to the interference claim and the defendants (now Weiss) would be relieved of all liability.

It is unfortunate and should be fatal that the defendants did not bring the proposition on which they now rely into the trial proper and make it the subject of appropriate additional special questions following upon relevant instructions. The judge in her memorandum of decision referred to the defendants' argument by acknowledging that the parties "contemplated" a joint venture, meaning the events after February 21 or conceivably, but not likely, all the events following Goldbaum's first meeting with Marshall. But, without further specific discussion of the defendants' contention in her memorandum, the judge applied c. 93A, § 11. We think this disposal of the defendants' contention was correct.

If the defendants deserve to have the contention examined on the record as it now stands, it is seen to be quite inapposite. The torts between coventurers or partners or the like excluded from

consideration under § 11 must be those occurring while the relationship exists, counting from the time of its earliest incipience — happening within the shell, so to speak, of the relationship. But in the present case, the plaintiff Goldbaum's letter of February 5, 1991, sealed off and concluded deliberately the antecedent discussions; his purchase of the option inaugurated a personal, competitive enterprise. The subsequent flurry of document drafting which "contemplated" a joint venture was not only a distinct phase, but a sham one, and figured, indeed, as the very interference with the plaintiff's enterprise wilfully inflicted. Section 11 controlled. Compare *Szalla* v. *Locke*, 421 Mass. 448, 451-452 (1995), and *Petricca Dev. Ltd. Partnership* v. *Pioneer Dev. Co.*, 214 F.3d 216, 223-224 (1st Cir. 2000), with *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 707-714 (1990), and *NASCO, Inc.* v. *Public Storage, Inc.*, 29 F.3d 28, 33-34 (1st Cir. 1994). So far as our conclusion would depend on inference, be it remembered that "the question before us [in reviewing a ruling on a motion for directed verdict or judgment n.o.v.] is . . . whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff[].' " *Rolanti* v. *Boston Edison Corp.*, 33 Mass. App. Ct. 516, 520 (1992), quoting from *Dobos* v. *Driscoll*, 404 Mass. 634, 656 (1989).

5. The defendants' penchant for delaying their shots until the battle is over appears again in the remaining argument of the defendant Weiss's brief on appeal, which considers the measure of damages against him assuming the plaintiff succeeds under § 11. The expert evidence on the part of the plaintiff was directed to justifying and calculating the profits to be expected from the operation of a Boston Chicken franchise in the café space, with a one-third split to the plaintiff.[6] The defendants did not dispute the theory on which the proof proceeded, nor did they ask for an instruction on any other basis, but Weiss's brief now disputes the plaintiff's theory and says the plaintiff, if successful, should recover only the amount of his loss occasioned by the defendants' acts. The argument comes too late. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 n.25 (1991); *Lumberman's Mut. Cas. Co.* v. *Hanover Ins. Co.*, 38 Mass. App. Ct. 53, 60 (1995).

[6] In response to Question 10, the jury found damages of $40,000, which the judge under the statute doubled, adding attorney's fees.

Finding no error in the denial of the motions for a directed verdict and the motions for judgment n.o.v. or in any other respect, we affirm the judgment appealed from.

*So ordered.*