Botsford, Margot, J.

INTRODUCTION

Plaintiff DSF Investors, LLC (DSF) filed this action seeking a declaratoiy judgment that a Term Sheet entered into with defendant Lyme Timber Company is a non-binding agreement creating no legal rights and obligations between the parties. This matter is before the court on DSF’s and third-party defendant Solomon’s motion for summary judgment on DSF’s complaint, Lyme’s counterclaim and Lyme’s third-party complaint under Mass.RCiv.P. 56. For the reasons discussed below, the motion for summary judgment is allowed in part and denied in part

BACKGROUND

The following is taken from the summary judgment record. The undisputed facts, and any disputed facts viewed in the light most favorable to the non-moving party are as follows.[2] Plaintiff DSF is a Delaware limited liability company with its principal office in Boston. Third-party defendant Arthur Solomon (Solomon) is a principal of DSF, which he established in 2000 as a real estate investment firm to invest in commercial real estate on behalf of private investors.
Defendant Lyme Timber Company (Lyme) is a New Hampshire limited partnership which invests in commercial real estate for its own account and in partnership with its investors. Defendant Woodland Management Associates, LLC (Woodland) is the general partner of Lyme. David Roby (Roby), Lyme’s co-founder and its chief executive officer, graduated from Harvard Law School and practiced law for six years as a corporate attorney at the now defunct Boston law firm of Herrick Smith. David Clem (Clem) is a principal of Woodland and Roby’s partner. Lyme’s commercial real estate operations are managed though its subsidiary Lyme Properties, LLC (Lyme Properties), from an office in Cambridge, and Lyme considers itself to be one of the preeminent developers of biotech laboratory space in Cambridge. Robert Green (Green) is Lyme Properties’ chief operating officer and reviews all legal matters for Lyme because he is an attorney who formerly specialized in real estate law at Gadsby Hannah, LLP.
Lyme was interested in purchasing the Neceo Building in Cambridge for development if Neceo could be convinced to relocate. In 1999, Lyme had done its own internal due diligence and investigated the Neceo Building for its own account. However, Lyme fell out of favor with Neceo after it purchased property located at 135 American Legion Highway in Revere (“the Revere Properly”), which it knew Neceo was interested in for its relocation.
In the summer of 2000, Bill Brodsky (Brodsky) and Elliot Ingerman formed Tribeca Associates, LLC (Tribeca) for the purpose of purchasing the Neceo Building. (Family connections of Brodsky’s led to his introduction to Necco’s chairman, Dom Antonellis.) On June 22, 2000, Tribeca and Neceo executed a letter of intent for Tribeca’s purchase of the Neceo Building through a “like-kind” exchange of property under §1031 of the Internal Revenue Code. At that time, Tribeca had an unwritten “handshake” agreement with the Davis-Solomon Investment Fund, run by Solomon, under which Tribeca was the operating partner and Davis-Solomon was the financial partner in a venture to purchase and develop the Neceo Building for telecommunications use. In accordance with this agreement, Tribeca dealt with various brokers and vendors seeking a replacement property for Neceo. Brodsky contacted Lyme about DSFs purchasing the Revere Property, but Lyme was not interested in selling at that time. On October 17, 2000, DSF sent a letter to its investors stating that DSF and Tribeca had obtained a letter of intent to purchase the Neceo Building.
On November 7, 2000, DSF executed an agreement with Tribeca to jointly pursue opportunities in technology-driven real estate assets. The agreement specifically identifies the Neceo Building as one such “investment opportunity” the parties would pursue. With respect to any pursued investment opportunity, the agreement provides that DSF would bear 90 percent of expenses and Tribeca 10 percent, and that DSF would give Tribeca the option to invest up to 15 percent of the total equity in a single purpose entity (referred to in the agreement as a “Newco”) formed to hold title to property under development.[3] On November 29, 2000, Davis Solomon Tribeca Cambridge, LLC executed a purchase and sale agreement and an Exchange Agreement for the Neceo Building. DSF agreed to assist Neceo with moving Necco’s headquarters to a new building to be identified and accepted by Neceo through a “like-kind” exchange of property under §1031 of the Internal Revenue Code.
In January of 2001, Solomon had meetings with Clem and Brodsky concerning Lyme’s Revere Property, which DSF hoped to acquire for the Neceo Building exchange. At some point in 2001, the bottom fell out of the telecommunications market and DSF and Tribeca began pursuing a biotechnology use for the *413 Neceo Building, although Solomon had no experience in biotechnology development.
By March of 2001, DSF had assembled a team for the Neceo Building project which included James Rafferty, an attorney specializing in zoning and planning, architects from Tsoi, Kobus & Assoc., engineers from AHA Consulting Engineers, Inc., structural engineers from McNamara/Salvia, Inc., traffic and parking consultants from Vanesse, and contractors from John Moriarty & Associates. Between March of 2001 and June 2002, this team met weekly to work on issues of permitting and zoning, real estate design and planning, parking and redevelopment.
In early April of 2001, Clem approached Solomon about a venture in which DSF and Lyme would pool Lyme’s Cambridge properties with the Neceo Building in pursuit of potential biotech tenants. Solomon rejected this proposal because he believed that Lyme’s Cambridge properties were vastly inferior to the Neceo Building. On April 3, Solomon asked Clem if Lyme would provide consulting services for the Neceo Building project in exchange for a fee, and Clem responded that Lyme did not do that. On April 12, Clem met with Solomon and others from DSF about the possibility of Lyme investing in and becoming a partner in DSF’s Neceo Building project. At this time, DSF was also talking to other potential investors, including Hynes, GE, Boston Properties and Forest City. DSF had already obtained investors in the Neceo Building project through subscriptions to its Technology Real Estate Club and the Neceo Real Estate Club, and had commitments totaling $65 million. Solomon never told Clem or Roby that DSF was developing the Neceo Building under the November 7, 2000, agreement with Tribeca.
Beginning in April of 2001, Lyme assisted DSF by providing insights based on its knowledge of biotech development in Cambridge and guidance with respect to the Article 19 approval process before the Cambridge Planning Board and other permitting issues. Over the next several months, Solomon met with Clem at least fifteen times, and Clem advised Solomon on issues such as price structure, disclosing Lyme’s price structure on its deals in Kendall Square and its letters of intent with Infinity, Whitehead and Microbia. Lyme also made other members of its development team available to Solomon, including its engineer in charge of construction project management for biotech development; an engineer with a background in biochemistry and certificates in real estate and real estate financing; and Lyme’s chief architect and planner. Lyme’s personnel, including Clem and Roby, reviewed and commented on architectural drawings of the building and proposed redevelopment plans; offered advice on the selection of contractors, architects, engineers and project managers; offered expertise concerning biotech buildings, including the use of penthouse space, environmental issues, mechanical needs of the building, parking issues and financing; and reviewed and critiqued budget proposals and cost estimates. Meanwhile, DSF was also being advised by its own project team, which as previously described, included architects, construction companies, and attorney James Rafferty. Representatives from Lyme were never present at any of the permitting and zoning meetings attended by Rafferty.
. In May of 2001, Solomon and Roby met once at Lyme’s office in Cambridge and spoke on the phone to discuss the terms of the proposed venture and in particular, the terms of a confidentiality agreement to be contained in a term sheet. In a May 8, 2001, memo to Clem, Solomon stated, “[s]ince we are starting to make some key decisions I want to select a strategic partner by next Wednesday, May 16.” In a May 9 memo to someone else, Solomon stated, “May 18 is our target date for making a decision about a strategic partner.” In a follow-up memo dated May 16, Solomon stated, “let’s discuss this week so that I can either encourage or discourage the other potential development partners.”
Between May and December of 2001, Brodsky met weekly with Solomon and took active steps toward leasing the Neceo building, marketing the property to prospective tenants through advertisements, meetings, review of proposals, and walk-throughs. Solomon never mentioned to Brodsky that Lyme was a partner in the Neceo Building project, and Brodsky never saw anyone from Lyme at any of the meetings he attended with DSF concerning the project.
In June of 2001, Solomon and Roby discussed by telephone the terms of their proposed venture, to be embodied in a draft term sheet. They also discussed various aspects of the project such as leasing, permitting, and historic tax credits. On June 7, 2001, Solomon faxed Roby a proposed confidential term sheet.
At some point in June, Lyme sold the Revere Property to DSF for $37 million. The property was to be used for the Neceo Building exchange.
On July 16, 2001, Solomon sent Roby a draft term sheet with a cover letter stating, “I’m enclosing the Admission to Partnership Agreement for the NECCO Building... please sign and return to me and then I’ll have our attorney use this term sheet as the basis for creating the Operating and Partnership document.” On July 31, Solomon forwarded to Roby a financial analysis showing the projected returns for the Neceo Building and how the partnership profit and distributions would work. The financial analysis showed that on the assumption that Lyme would be investing $15 million in the project, its return on its investment would be $39,746,284. It also included a projection that, similar to a provision in the November 7, 2000, agreement with Tribeca, provided for increasing percentages of return on Lyme’s investment as the Neceo Building project internal rate of return increased. According to Roby, this financial analysis reflected all *414 the core terms of the business deal he and Solomon had been discussing. The cover letter accompanying the financial agreement set forth a revised capital structure and stated, “Within reason, we’ve tried to accommodate your comments since we believe that Lyme would be a good partner. However, this is our final position. Let’s discuss.” The financial analysis does not mention Tribeca.
On August 14, 2001, Solomon sent Roby a document entitled “Confidential Term Sheet for the Admission of LYME TIMBER Company to the Ownership of the Neceo Building in Cambridge, Massachusetts” (“the Term Sheet”). The Term Sheet states:
The purpose of this Term Sheet is to (i) confirm our non-binding understanding of the basic business terms on which: (a) Lyme TIMBER Company (“the Lyme”) would be admitted as a member of DSF Investors in connection with the interest of DSF in the Property (but without any rights or obligations with respect to any other assets); and (b) DSF Investors would cause DSF Holdings, DSF Cambridge Holdings, and DSF Cambridge (collectively, the “DSF Entities”) to: (y) cany out the transactions contemplated by the Purchase/Exchange Agreement; and (z) own, redevelop, lease, manage, finance and otherwise deal in and with the Property ((y) and (z), collectively, the “Project’); and (ii) set forth the binding obligations of Lyme with respect to the confidentiality obligations set forth in Section X below.
Section 11 of the Term Sheet states:
Except for the agreements contained in the Section above entitled “Confidentiality” (which are binding upon Lyme), neither DSF Investors, Lyme nor any of their respective affiliates has any legally binding obligation in connection with this Term Sheet or the transactions contemplated hereby, and no party will be legally bound in any manner unless and until, acting in its sole discretion, it executes and delivers definitive and legally binding written agreements. No negotiations, course of conduct or other circumstance shall create any legally binding obligations on the part of the parties hereto or their affiliates with respect to this Term Sheet or the transactions contemplated hereby, and any party may, in its sole discretion and for any reason or no reason, terminate this Term Sheet and all related discussions and negotiations at any time. This Term Sheet may be executed in any number of counterparts, each of which, when executed and delivered, will constitute a single agreement. This Term Sheet may be amended only by a written instrument signed by both Lyme and DSF Investors.
Lyme often used similar “non-binding” boilerplate language in its term sheets in connection with lease negotiations, particularly where several proposals were outstanding at the same time.
Roby made some modifications to the Term Sheet, but not to Section 11 quoted above. Roby then signed the Term Sheet on August 21,2001, on behalf of Lyme by Woodland, and returned it to Solomon. In signing the Term Sheet, Roby was aware of the language stating that it was non-binding and that there was no deal until a definitive written agreement was executed. Roby understood this language and it was a correct manifestation of his intent in going forward with Solomon at that time.
On August 22, 2001, Solomon sent Roby a fax memorandum in which he accepted two of the changes to the Term Sheet made by Roby but also stated that DSF did not agree to the third. Solomon wrote a fairly detailed explanation of his position on that third point and of how he proposed to deal with the problem at hand — making up a shortfall in senior debt at a particular time[4] — and stated, “(tjhus, we need to delete the third condition you added to the Investor Funding Condition and instead, add a separate sentence related to a possible shortfall in the senior debt at the time of the Exchange . . . Please give me a call if you need to discuss this further. Otherwise, I’ll have our lawyer incorporate the term sheet with your point about needing Lyme’s consent above $15 million into a definitive agreement.” Solomon then left Roby a voice mail message to the same effect. Roby never called or otherwise contacted Solomon in response. Solomon executed the Term Sheet on August 23, 2001, after “whiting out” the condition he did not agree to and adding two sentences about DSF providing senior debt. Roby never received the executed Term Sheet back with Solomon’s signature.
At some point in September 2001, Roby orally made a commitment to Solomon that Lyme would contribute $15 million of capital to the project. Roby informed the partners at Woodland of this commitment, but did not tell Lyme’s controller. Lyme never set aside any money into a specific bank account that was isolated for DSF, but according to Roby, it had the $15 million available at all times.
The Term Sheet contains a provision stating: “Upon the execution and deliveiy of the definitive legal documents (which the parties anticipate to occur by September 14, 2001), Lyme shall provide DSF Investors with $3,500,000 (the “InitialInvestor Contribution”). . . (Term Sheet, Section IV(i), Capitalization, p. 3). However, Solomon sent to Roby the first draft of the proposed operating agreement — the principal ’’definitive legal document" — on September 21, 2001. Around the time the draft was sent, and apparently in response to a question from Roby about the absence of a definitive operating agreement by September 14, Solomon told Roby:
Don’t worry about that. The important thing is that we have a partnership, we have an agreement, that we are going forward together. What’s important to me is that you tell me that there’s $15 million *415 available for the equity requirement for this deal. We’ll get to the operating agreement and get those details figured out. Meanwhile let’s go forward together. We’ve got a deal, we’ve got a partnership, we are going to make tons of money.
(Roby deposition, pp. 147-48.)[5] Roby considered this an “oral handshake” and believed that DSF and Lyme had reached a binding agreement and that the partnership with DSF was a “done deal.” Roby never viewed the Term Sheet as a binding definitive agreement memorializing the terms of the parties’ deal; rather, he viewed the Term Sheet as the embodiment of the parties’ core terms, with the Operating Agreement a mere formality addressing administrative details. However, Roby is not aware of any other real estate venture in which Lyme has proceeded as a partner without an executed operating agreement.
The September 21, 2001, draft “Limited Liability Company Operating Agreement” that Solomon sent to Roby detailed capital requirements, allocation of income and loss, distributions, powers and duties of the participants, transfer of partnership interests, and reporting, records and accounting matters. The draft contains a definition section (Article I) that includes the term “Term Sheet” which is defined as follows:
“Term Sheet” — means the Confidential Term Sheet for the Admission of Lyme Timber Company to the Ownership of the Neceo Building in Cambridge, Massachusetts between the Company[6] and Lyme Timer Company dated August 14, 2001.
This definition is carried in eveiy draft operating agreement that was prepared.
By the end of September 2001, DSF and Lyme had not yet reached final agreement on the issue of governance of the venture. On November 8, 2001, Solomon sent Roby another version of the Operating Agreement, with numerous proposed changes, particularly to the sections concerning dissolution, liquidation and termination. In mid-November, Solomon met with Clem and informed him that several things in Roby’s mark-up of the draft, involving issues of control and governance, were “deal killers.” On November 26, 2001, Roby wrote out a list of the pros and cons of the Neceo Building venture for his file, in accordance with his practice of monitoring the pros and cons of every deal from beginning to end. Solomon and Roby had a meeting on November 30 at which they discussed Roby’s concerns that the budget was increasing, that DSF’s rent estimates were overly optimistic, and issues relating to forfeiture and return of Lyme’s required investment of $5 million.
In December of 2001, Solomon and Roby were still negotiating the remedy for a failure by DSF to meet its capital obligations, with Roby proposing that DSF lose the credit for its deemed capital contribution (“Agreed Value” contribution) of $15 million. Solomon was concerned with the lack of language addressing the use of historic tax credit money, and did not intend to accept Roby’s proposed term that Lyme receive its entire investment back under certain circumstances. On December 9, Roby sent Solomon a mark-up of the draft Operating Agreement addressing eighteen different points and Solomon responded with a memo on December 10 stating, “I’m not willing to accept additional changes to the Agreement at this time. Frankly, if you want to retrade what has already been agreed upon, I’ll require the same right and the negotiations will become endless.” On December 18, DSF attended its Article 19 hearing in front of the Cambridge Planning Board. Lyme did not oppose DSF in this process.
On December 20,2001, Solomon sent Roby a memo which addressed the eighteen unresolved points and stated, “we need to restrict our discussions to the foregoing eighteen points.” The points still being negotiated included whether Lyme had authority to trigger dissolution as a remedy for DSF’s failure to meet its capital obligations, the issue of additional capital, and whether DSF could produce financial statements within 60 days after the end of the year. At one point, Roby characterized DSF’s position that it could not do the latter as a “deal killer.”
On January 4, 2002, Solomon sent Roby a memo stating: “We’re getting close. I believe there really is only one remaining issue which is discussed in item 3 below.” Item 3 involved the dissolution of the LLC and the winding down of the planned limited liability company that would constitute their joint venture to own and develop the Neceo Building project (“joint venture LLC”). Roby and Solomon discussed Solomon’s January 4 memo on January 11, after which Roby wrote a memo to Lyme’s file, stating:
I agreed with Art today that the changes set forth in his January 4 memo are acceptable, but that we need to make it clear that we have consultation rights on sales of the property with the right to buy ourselves and that we need a remedy for the possibility (however remote) that DSF fails to discharge its obligation under §3.2.1 to provide capital. I explained that dissolution was an acceptable remedy because it would cut the gordian knot and permit us to go forward. He acknowledged that we cannot be left in limbo on this issue but wants to consider other remedies.
On January 17, 2002, Solomon wrote to Roby setting forth a proposed solution to Lyme’s concerns that DSF might default on its obligation to provide capital. Solomon then stated, “I trust that the foregoing is okay. Please advise as soon as possible so that I can send you copies of the Purchase and Exchange and Mezzanine Loan Agreements, and have our attorney finalize the Operating Agreement for your review and signature.” On January 18, Roby handwrote on Solomon’s letter “Good solution, - please proceed” and faxed it to Solomon. On January 22, Solomon sent Roby a copy of the purchase and exchange agreement *416 with NECCO and the mezzanine loan agreement — documents he had not been willing to send while the terms of the Operating Agreement were still under negotiation — in a letter stating, “I’ve asked our attorney to incorporate the changes that we’ve agreed to into a final Operating Agreement for your review and signature.” On February 4, 2002, Solomon sent Roby a red-lined draft of the Operating Agreement that he indicated showed the changes that they had agreed upon since the November 8, 2001, draft.
On February 6, 2002, Solomon sent Roby a clean copy of this same draft Operating Agreement (with a print date reflected on it of February 5, 2002) under cover of an e-mail that stated, “Please call once you’ve had an opportunity to review so that we can finalize the Agreement.” Every page of this document states “DRAFT’ in the upper right hand comer. Roby forwarded the February 5 draft agreement to Green and Clem for their review, but never received any comments back from them.
Around this time, Lyme formed Lyme/NC, LLC as a single purpose entity to execute the Operating Agreement and become DSF Equity, LLC’s partner in DSF Investors, LLC, the name of the proposed joint venture LLC. Although Section 3.1.3 of the draft Operating Agreement stated, “[a]s of the date hereof, Lyme shall provide the company by wire transfer of federal funds with a capital contribution in the amount of $3,500,000,” Lyme never wired the money to DSF in Januaiy or February of 2002 — because, according to Roby, DSF never requested that it do so. However, also according to Roby, Lyme was willing and able to make that investment at anytime, had Solomon so requested. Lyme never disclosed to its independent accountant, Price Waterhouse Coopers, that it had a partnership with DSF or Solomon, or that it had made a $15 million commitment to the Neceo Building project, and no reference to the project appears in Lyme’s December 31, 2001, and December 31, 2002, consolidated financial statements.[7]
On March 4, 2002, DSF made a lease proposal to Novartis for the Neceo Building. On March 14, Lyme Properties entered into a letter of intent to rent its 320 Bent Street property in Cambridge to Novartis.
Three days later, on March 17, 2002, Roby sent back to Solomon a new copy of the February 5 draft of the Operating Agreement with a cover letter stating, “Herewith a markup of 2/5/03 draft of the Operating Agreement + a copy of the 1st page of your memo of 1 /4/02 (referred to in the markup). I trust you will find all to be in order.” The version of the draft that Roby sent back contained a number of changes from the February 5 draft. According to Roby, when he reviewed the February 5 draft, he found several instances where he believed the draft Operating Agreement did not accurately reflect his understanding with Solomon. He therefore edited the language of the February 5 draft and sent those pages with his handwritten comments to Solomon. Roby’s changes included, among others, an insertion that Lyme could be a purchaser of the property in the section concerning DSF “Sale Rights”; making changes to the section concerning Lyme’s remedies, including the trigger for such remedies; inserting the phrase “exercising its good-faith business judgment” in several places in the “Member Consultation Rights” section; and changing the “Default Loan” provision from no recourse against DSF to full recourse.
In Roby’s view, the changes he made did not alter the substance of the parties’ agreement but rather, ensured that the written document reflected that agreement. However, Solomon viewed Roby’s changes as attempts to erode DSF’s control over the project, and no further communications about the Operating Agreement took place between Solomon (or any other DSF representative) on the one hand, and Roby (or any Lyme representative) on the other.[8] On March 30, 2002, Solomon sent Roby an e-mail in which he congratulated Lyme on landing Novartis and then stated: “With respect to the NECCO building, since so much time has elapsed the risks /rewards of an investment have changed significantly. Thus, I feel obligated to review the proposed capital structure with my original investors. I plan to complete the review by the end of April and will contact you immediately thereafter.” On April 1, 2002, Clem faxed Solomon a note stating, “the fact is that we have an agreement on the Neceo building. We intend to honor the agreement. We expect you to do the same.”
On June 28,2002, Solomon sentTribeca’s Brodsky a letter stating that DSF’s November 7, 2000, agreement with Tribeca did not apply to development of the Neceo Building because it was a non-communications tenant, and because the agreement had expired by its terms. Solomon denied that Tribeca was entitled to any profit from the successful development of the Neceo Building except for a referral fee.[9]
On September 12, 2002, DSF filed this declaratory judgment action against Lyme. On October 2, 2002, Lyme filed suit against DSF and Solomon in Grafton Superior Court in New Hampshire. Count I of Lyme’s complaint sought a partnership accounting, Count II alleged breach of fiduciary duty, Count III alleged promissory estoppel, Count IV alleged negligent misrepresentation, Count V alleged fraud, and Count VI alleged violation of the consumer protection statute, R.S.A. 358-A.-2.[10] On November 19, 2002, DSF filed its amended complaint for declaratory judgment in this action seeking a declaration that no binding agreement or relationship exists between itself and Lyme based on the Term Sheet. Lyme filed a counterclaim against DSF seeking a partnership accounting in Count I and alleging breach of fiduciary duty in Count II, promissory estoppel in Count III, negligent misrepresentation in Count IV, fraud in Count V and violation of Chapter 93A in Count VI. Lyme also filed *417 a third-party complaint against Solomon, asserting claims identical to those in the counterclaim.
Ultimately, Novartis entered into a deal with DSF to lease the Neceo Building. In January of 2003, the exchange between DSF and Neceo of the Neceo Building and the Revere Property occurred, and Novartis began paying DSF rent for the Neceo Building. The rent is an initial triple net rent of $5 million per year until January 1, 2006, when the rent increases to $10 million per year, with a ten percent increase every five years thereafter. In September of 2003, Novartis paid $20 million for an option to purchase the Neceo Building for approximately $142 million.

DISCUSSION

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’lBank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805,809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
1. Request for Declaration and Partnership Accounting[11]
DSF contends that it is entitled to judgment as a matter of law on its request for a declaration that no binding agreement or relationship exists between itself and Lyme, and on Count I of Lyme’s counterclaim seeking a partnership accounting. DSF argues that Lyme and DSF never entered into an enforceable partnership agreement because Section 11 of the Term Sheet requires an executed definitive agreement, and it is undisputed that the parties never executed such an agreement. Lyme contends that the Term Sheet never became a binding agreement, or in the alternative, that the parties either modified or waived the Term Sheet’s requirement of an executed written agreement and the parties orally reached a binding agreement on all material terms of the partnership in September of 2001 or in any event by January of 2002.[12]
A partnership is an association of two or more persons to carry on as co-owners a business for profit. Boyer v. Bowles, 310 Mass. 134, 138 (1941); Fenton v. Bryan, 33 Mass.App.Ct. 688, 691 (1992). The question of whether there is a partnership is one of intent that must be proved by an express agreement, either written or oral, or be inferred from the acts or conduct of the parties. See Fenton v. Bryan, 33 Mass.App.Ct. at 691; Shain Investment Co., Inc. v. Cohen, 15 Mass.App.Ct. 4, 7 (1982); John Alden Transp. Co., Inc. v. Bloom, 11 Mass.App.Ct. 920, 921 (1981). Factors relevant to whether there is a partnership include the existence of an agreement to act as partners, a sharing of losses and profits, and participation by the parties in the control or management of the enterprise. Boyer v. Bowles, 310 Mass, at 138; Fenton v. Bryan, 33 Mass.App.Ct. at 691; Shain Investment Co., Inc. v. Cohen, 15 Mass.App.Ct. at 7-10. DSF argues that formation of a binding partnership with respect to the Neceo Building project is precluded by the absence of a definitive executed agreement in accordance with Section 11 of the Term Sheet. Under Massachusetts law, parties to a preliminary agreement may provide that they do not intend to be bound until execution of a more detailed and formal agreement. See McCarthy v. Tobin, 429 Mass. 84, 87 (1999); Goren v. Royal Investments, Inc., 25 Mass.App.Ct. 137, 142 (1987), rev. denied, 401 Mass. 1104 (1988). “There is commercial utility to allowing persons to hug before they marry.” Goren v. Royal Investments, Inc., 25 Mass.App.Ct. at 142. If parties to what would otherwise be an enforceable bargain agree that their legal relations are not to be affected until a later binding agreement, the law will respect such a term. Goren v. Royal Investments, Inc., 25 Mass.App.Ct. at 142, although it is important to articulate such an agreement in terms that “speak plainly...” Id. at 142-43. Accord, McCarthy v. Tobin, 429 Mass, at 88 n. 3, and cases cited. The controlling fact is the intent of the parties. McCarthy v. Tobin, 429 Mass. at 87.
Here, the parties spoke very plainly: Section 11 of the Term Sheet is unequivocal and unambiguous that there will be no binding agreement with respect to the Neceo Building project until the parties execute a definitive written agreement, that the parties’ negotiations and course of conduct shall not create any legally binding obligations, and that either party may terminate the negotiations at any time for any reason. [13] An unambiguous agreement is to be enforced according to its terms, Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992), and the language in Section 11 certainly qualifies as “the sort of express limiting provision which [the Appeals Court has] described ... as affording a safe harbor to parties who do not wish to be bound by a preliminary document.” Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct 390, 393 (1991), S.C., 412 Mass. 703 (1991).[14]
Nonetheless, Lyme contends that Section 11 of the Term Sheet is not enforceable according to its terms. Lyme’s first argument is that the Term Sheet was not “delivered” in accordance with its express terms, which in Lyme’s view made delivery a condition precedent.[15] A condition precedent defines an event *418 which must occur before a contract becomes effective or before an obligation to perform arises under the contract. Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 45 (1991); Cheschi v. Boston Edison Co., 39 Mass.App.Ct. 133, 142, rev. den., 421 Mass. 1102 (1995). To determine whether there is a condition precedent, the court must ascertain the parties’ intent by considering the words used by the parties, the agreement taken as a whole, and the surrounding facts and circumstances. Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass, at 45-46. “Emphatic words” such as “if and when,” “provided that” and “on condition that” are generally considered necessary to create a condition precedent. Id. at 46, and cases cited. See Thomas v. Massachusetts Bay Transportation Auth., 39 Mass.App.Ct. 537, 543 (1995), rev. den., 422 Mass. 1104 (1996). Absent such emphatic words, a condition precedent will be found only where the parties’ intent to create one is clearly manifested in the contract as a whole. Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass, at 46.
The language in the Term Sheet on which Lyme relies for its argument is the penultimate sentence of Section 11 (quoted above, p. 8), which reads: “This Term Sheet may be executed in any number of counterparts, each of which, when executed and delivered, will constitute a single agreement.” The threshold difficulty with Lyme’s reliance is that this sentence has no application in the present case because no “counterparts” of the Term Sheet were ever executed. A “counterpart” is “one of two or more copies or duplicates of a legal instrument.” Black’s Law Dictionary 354 (7d ed. 1999). Here, Roby signed a single copy of the Term Sheet and returned it to Solomon, who signed the same copy.
More fundamentally, the sentence in question simply does not create a condition precedent to the enforceability of the Term Sheet. No “emphatic words” are used,[16] and the sentence is reasonably understood to make the obvious point that if two (or more) copies of the Term Sheet are executed and delivered, there is still only one agreement. While it is true that even “[i]n the absence of the usual words, a condition precedent may nonetheless be found to exist if the intent of the parties to create one is clearly manifested in the contract as a whole!,]” Massachusetts Municipal Wholesale Electric Co. v. Danvers, 411 Mass, at 46, there is no such manifestation of intent in the Term Sheet read as a whole. Nor is there any evidence in the summary judgment record apart from the text of the Term Sheet to suggest that Lyme and DSF affirmatively intended that delivery of a copy of the fully executed Term Sheet to each party was a necessary condition to its effectiveness. See Id. at 46-47;[17] Thomas v. Massachusetts Bay Transportation Auth., 39 Mass.App.Ct. at 543. Absent a condition precedent, delivery of an executed written contract to the other party is not necessary for formation of a contract and may be viewed as a mere formality. See Hunt v. Rice, 25 Mass.App.Ct. 622, 629-30 (1988) (contract language stating “if an offer is acceptable . . . the Purchase and Sale Agreement will be executed by us . . . and mailed or delivered to the successful bidder no later than Tuesday, December 4, 1984 did not make delivery a condition precedent). Accordingly, the Term Sheet is not unenforceable due to failure of a condition precedent.[18]
Lyme next argues that Solomon waived the requirement in Section 11 of the Term Sheet that the parties would not be bound until execution of a definitive, written agreement. Conditions and clauses of a contract may be waived, either expressly or by words and conduct. McCarthy v. Tobin, 429 Mass, at 88-89; Owen v. Kessler, 56 Mass.App.Ct. 466, 470 (2002). Waiver is the voluntary and intentional relinquishment of a known right. Merrimack Mut. Fire Ins. Co. v. Nonaka 414 Mass. 187, 188 (1993). See Dunkin Donuts, Inc. v. Panagakos, 5 F.Sup.2d 57, 61 (D.Mass. 1998). Waiver is determined by an objective assessment of the conduct of the party alleged to have surrendered its contractual rights; the subjective belief by the other party that there has been a waiver is insufficient, and the evidence reflecting waiver must be strong. See Owen v. Kessler, 56 Mass.App.Ct. at 470-71 (nowaiver found where evidence of waiver was not sufficiently “compelling”). See also Dunkin Donuts, Inc. v. Panagakos, 5 F.Sup.2d at 60 (Massachusetts standard for waiver “is an uncompromising one” [internal quotation omitted]; summary judgment allowed against the party claiming waiver). The burden of proving waiver is on the party asserting it, see id., and the issue of waiver is ordinarily one for the fact finder. However, if the facts are undisputed, waiver is a question of law. See McCarthy v. Tobin, 429 Mass. at 88-89 n. 5.
Lyme contends that Solomon’s failure to provide it with a draft of the Operating Agreement by September 14, 2001, the date stated in the Term Sheet, shows that Solomon waived the requirement of a definitive executed document. The argument fails. The Term Sheet mentions the date of September 14, 2001, essentially in passing, in setting out the proposed schedule for Lyme’s contribution of capital contributions to the project. The specific sentence is this: “Upon the execution and delivery of the definitive legal documents (which the parties anticipate to occur by September 14, 2001), Lyme shall provide DSF Investors with $3,500,000 (the “Initial Investor Contribution:’).’’ (Term Sheet, Section IV(i), Capitalization, p. 3). There is nothing in the language of the Term Sheet that states or suggests that this “anticipated” date was intended to be definitive, or one that, if it were missed, would have any effect on any other provision of the Term Sheet or right of any party. Compare Owen v. Kessler, 56 Mass.App.Ct. at 466-67, 469-70 (discussion of “time is of the essence” clause). Accordingly, Solomon’s letting the date go by without sending any draft of the Operating Agreement cannot reasonably *419 be viewed as a waiver of anything.[19] Nor is Solomon’s statement, apparently made later in September, that there was no rush to execute the Operating Agreement provide the type of clear or decisive or unequivocal evidence (see Dunkin Donuts, Inc. v. Panagakos, 5 F.Sup.2d at 60, 61, and cases cited) that would be necessary to indicate that DSF was surrendering its right to insist that the parties not be bound until such a document was executed. Cf. McCarthy v. Tobin, 429 Mass. at 88-89 (seller waived “time is of the essence” .clause in purchase and sale agreement by failing to produce draft agreement until after deadline had virtually passed, failing to object to passage of deadline, and continuing to deal with buyer in effort to close the deal).
Lyme further argues that Solomon’s statements in September of 2001 to the effect that DSF and Lyme “had a partnership, had an agreement, were going forward together and were going to make tons of money” evidenced a waiver of the Term Sheet’s requirement of a definitive executed agreement. These statements cannot be viewed as clear manifestations that DSF would not hold Lyme to Section 11 of the Term Sheet, given that both parties acknowledged there were still many important details to be hammered out before an Operating Agreement could be signed. See American Oil Co. v. Katsikas, 1 Mass.App.Ct. 437, 440 (1973) (evidence that despite bumps in the negotiations, parties acted as though deal was going forward did not support finding of waiver of provision requiring closing on certain date). Cf. Southern Colorado MRI, Ltd. v. Med-Alliance, Inc., 166 F.3d 1094, 1099 (10th Cir. 1999) (parties implicitly waived provision in letter of intent requiring execution of written asset purchase agreement as condition of closing, where parties had reached agreement on all material terms, indicated desire to be bound, and took steps consistent with already being bound).
Similarly, Solomon’s memo in January of 2002 purporting to resolve the remaining issue between the parties and his conduct in sending Roby the previously withheld purchase and exchange and mezzanine loan agreements reasonably cannot be considered clear or decisive evidence indicating that DSF would not insist on adherence to the requirement that the parties not be bound until a definitive agreement was executed. Indeed, Solomon’s January 22 letter forwarding the documents to Roby stated that his attorney was finalizing the Operating Agreement for Roby’s review and signature, indicating that he still viewed formal execution as necessary.
In sum, when the summary judgment record is considered in the light most favorable to Lyme — as it must be — it shows at best that the parties had resolved the essential substantive terms of their agreement by January 22. But in light of the explicit “safe harbor” words used in Section 11 concerning the need for a definitive written document and its disavowal of words or conduct suggesting otherwise, this evidence suggesting the parties had resolved the essential terms of the Operating Agreement cannot reasonably be viewed as indicating or implying a surrender by DSF of its Section 11 right to insist that the parties execute a definitive written agreement before being contractually bound together. Accordingly, I conclude that Lyme has failed to raise a genuine issue of material fact with respect to waiver of Section 11 of the Term Sheet. Given that DSF never executed the Operating Agreement, Lyme cannot prevail on its claim that the parties reached a binding agreement with respect to the Neceo Building project. [20]
Accordingly, DSF is entitled to judgment as amatter of law on its complaint seeking a declaratory judgment that no binding agreement was created or existed between itself and Lyme with respect to development of the Neceo Building project as partners or joint venturers. DSF is also entitled to summary judgment on Count I of Lyme’s counterclaim seeking a partnership accounting.
2. Breach of Fiduciary Duty
Count II of Lyme’s counterclaim alleges breach of fiduciary duty. It is well established that partners owe each other a fiduciary duty of the highest degree of good faith and fair dealing. See Starr v. Fordham, 420 Mass. 178, 183 (1995); Meehan v. Shaughnessy, 404 Mass. 419, 433 (1989). I have concluded, however, that no partnership arose between DSF and Lyme. There are other limited circumstances in which a fiduciary duty may arise. To establish that DSF owed Lyme the duties of a fiduciary, Lyme must show at least that the relationship was one of trust and confidence, that Lyme relied upon DSF’s specialized knowledge or judgment, and that DSF was aware of Lyme’s reliance upon it. See Davidson v. General Motors Corp., 57 Mass.App.Ct. 637, 642 (2003). The summary judglnent record is devoid of any evidence that DSF and Lyme were involved in anything but an arms-length business relationship with respect to the Neceo Building project. There is no evidence that Lyme relied on DSF’s specialized knowledge and judgment or that DSF was aware of any such reliance. The mere fact that Lyme trusted DSF because of Solomon’s prior acquaintance with Clem is insufficient to elevate the transaction of business between equally sophisticated businessmen to a fiduciary relationship. A business relationship is not transformed merely because trust was reposed by one party in the other. Davidson v. General Motors Corp., 57 Mass.App.Ct. at 643. Accordingly, Lyme has no reasonable expectation of demonstrating that DSF breached a fiduciary duty owed to it, and DSF is entitled to judgment as a matter of law on Count II of the counterclaim.

3. Promissory Estoppel

Count III of Lyme’s counterclaim seeks recovery under a theory of promissory estoppel, alleging that *420 Solomon made repeated promises over the course of several months that DSF and Lyme were partners in the Neceo Building project and that Lyme would receive a one-third interest in DSF Investors. A promise may be enforceable by virtue of reliance under a traditional contract theory, with reliance substituting for consideration. See Cataldo Ambulance Service, Inc. v. Chelsea, 426 Mass. 383, 386 (1998); Rhode Island Hosp. Trust Nat’l Bank v. Varadian, 419 Mass. 841, 849-50 (1995). To recover under such a theory, the plaintiff must prove an unambiguous promise, which the promissor should reasonably expect to induce action or forbearance, and that the plaintiff reasonably relied on the promise to his detriment. Rhode Island Hosp. Trust Nat’l Bank v. Varadian, 419 Mass. at 848-49.
A promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract. Id. at 850. Lyme cannot show that DSF made a promise in the contractual sense, given that Solomon’s statements that they “had a partnership, had an agreement, were going forward together and were going to make tons of money” directly conflicted with the unambiguous intent expressed in Section 11 of the Term Sheet that the parties would not be bound until execution of a definitive written agreement. See id. (No promise in a contractual sense where oral promise of loan conflicted with parties’ understanding that written agreement would govern the intricacies of their deal.) Because there was no promise in the contractual sense, no amount of reliance by Lyme would give rise to recovery under a theory of promissory estoppel. See Rhode Island Hosp. Trust Nat’l Bank v. Varadian, 419 Mass. at 850.[21]
Further, in light of the specific and explicit terms of Section 11 of the Term Sheet, any reliance by Lyme on Solomon’s statements that they were partners and were going forward to make a ton of money was unreasonable as amatter of law.[22] See Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 468 (2003) (businessman’s reliance on other parly’s statement or conduct during the course of mutual congratulations at having reached a deal was unreasonable as a matter of law where it conflicted with documents stating that deal was not binding unless accepted by duly authorized representative of company); Rhode Island Hosp. Trust Nat’l Bank v. Varadian, 419 Mass. at 848-50 (where parties contemplated a written agreement for a $43 million loan, it was unreasonable as a matter of law for experienced businessman to rely on bank’s oral promise to make the loan).
Finally, Lyme has no reasonable expectation of demonstrating that it substantially relied on Solomon’s promise to its significant detriment. To work an estoppel, it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done, resulting in affirmative harm. See, e.g., Royal-Globe Ins. Co. v. Craven, 411 Mass. 629, 635 (1992). Here, although Lyme alleges that it provided valuable consulting services to DSF in reliance on Solomon’s promises of a partnership, it appears that the bulk of those services were provided in the spring of 2001, prior to the execution of the Term Sheet and Solomon’s September 2001 statements that the parties were going forward as partners. It is undisputed that Lyme never made any financial investment in the Neceo Building project, and Lyme has been unable to identify any specific opportunity or deal that it passed up in reliance on Solomon’s alleged promises.
DSF is entitled to judgment as a matter of law on Count III of Lyme’s counterclaim for promissory estop-pel.
4. Misrepresentation
Count IV of Lyme’s counterclaim alleges negligent misrepresentation, while Count V alleges fraud. Massachusetts recognizes a claim for negligent misrepresentation where the defendant, in the course of his business, supplied false information for the guidance of another upon which the plaintiff justifiably relied to his financial detriment, and the defendant failed to exercise reasonable care in obtaining or communicating the information. Nycal Corp. v. KPMP Peat Marwick, LLP, 426 Mass. 491, 496 (1998); Cole v. New England Mut Life Ins. Co., 49 Mass.App.Ct. 296, 300 (2000). Negligent misrepresentation does not require a showing that the defendant knew the statements were false or actually intended to deceive the plaintiff. Kitner v. CTW Transport, Inc., 53 Mass.App.Ct. 741, 749 (2002). In a common-law action for fraud, the plaintiff must prove that the defendant made a false representation of a material fact with knowledge of its falsify for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation to his detriment. Sahin v. Sahin, 435 Mass. 396, 402 n. 9 (2001).
Lyme alleges that Solomon misrepresented that DSF had acquired the rights to the Neceo Building and that DSF would have its affiliates carry out various transactions so that the conditions to DSF’s ownership of the Neceo Building would be satisfied. There is no evidence in the summary judgment record that these alleged statements were either false when made, or were material to the transaction. Lyme argues that the fact that DSF had an undisclosed deal with Tribeca to develop the Neceo Building demonstrates that DSF knew that it could not have its affiliates take sole ownership of the property. However, the record shows that Solomon was in control of DSF and all its affiliates, and that DSF ultimately did own the Neceo Building apart from Tribeca.
Lyme further asserts a fraud claim based on Solomon’s statements that there was no rush to execute the formal legal documents, that the parties had *421 an agreement on the basic terms and conditions of the partnership, and that Lyme would receive a one-third partnership interest in the Neceo Building project. Lyme argues that it provided valuable consulting services to DSF in the spring and summer of2001 based on Solomon’s statements. A statement of a present intention as to future conduct may be the basis for a fraud action if the statement misrepresents the actual intent of the speaker and was relied upon by the recipient to his detriment. Starr v. Fordham, 420 Mass. at 187; McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 709 (1990). To prevail on such a claim, Lyme must provide evidence that at the time Solomon stated that DSF and Lyme would be partners, he had no intention of culminating the parties’ negotiations with a binding agreement. The intention of the prom-isor not to perform an agreement cannot be established solely by proof of its subsequent nonperformance. See Zhang v. Massachusetts Institute of Technology, 46 Mass.App.Ct. 597, 606 (1999). To meet this difficulty, Lyme emphasizes the fact that DSF had a prior (written) agreement with Tribeca which covered the Neceo Building project, was negotiating the details of a venture with Tribeca at the same time it was negotiating with Roby, and was utilizing Tribeca’s services at the same time as it was utilizing Lyme’s expertise on the project. Lyme argues that DSF could not have partnered with both Tribeca and Lyme under the terms promised to each, thereby warranting an inference that Solomon never intended to consummate the deal with Lyme by executing a binding partnership agreement.
I agree that the Tribeca evidence presents material issues of fact about whether Solomon ever intended to form an agreement with Lyme, contrary to his statements that he did. Nevertheless, to the extent that Lyme alleges fraud based on the statements made by Solomon after execution of the Term Sheet to the effect that DSF and Lyme were going forward as partners, again[23] the claim must fail for lack of reasonable reliance. See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 59-60 (2004) (although reliance is normally a question of fact, in some circumstances a plaintiffs reliance on oral statements in light of contrary written statements is unreasonable as a matter of law). Cf. McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass, at 710-12 (fraud could be proved by evidence that party misrepresented its intent not to invoke a particular clause of a proposed written agreement, where the misrepresentations were not part of negotiations but were made at the time of signing, thereby inducing the other party to execute the agreement).

5. Chapter 93A

Finally, Count VI of Lyme’s counterclaim alleges violation of G.L.c. 93A, §11. DSF contends that Lyme’s c. 93A claim is barred by the doctrine of judicial estoppel because §11 requires that the unfair or deceptive conduct have occurred “primarily and substantially in Massachusetts,”[24] and Lyme argued in the Grafton Superior Court in New Hampshire that DSF was engaged in trade or commerce in that State for purposes of New Hampshire’s Consumer Protection Act. The doctrine of judicial estoppel precludes a party in certain circumstances from asserting a position in one proceeding that is contrary to a position that the party previously asserted successfully in another proceeding. East Cambridge Sav. Bank v. Wheeler, 422 Mass. 621, 621 (1996); Fay v. Federal Nat’l Mortgage Ass’n, 419 Mass. 782, 787-88 (1995). The critical inquiry is whether the party is seeking to use the judicial process in an inconsistent way that courts should not tolerate. East Cambridge Sav. Bank v. Wheeler, 422 Mass, at 623.
Lyme successfully defeated DSF’s motion to dismiss the New Hampshire action on personal jurisdiction grounds. The Grafton Superior Court concluded that DSF had sufficient minimum contacts with New Hampshire, consisting of numerous phone calls and letters during the course of negotiations which included alleged misrepresentations, for the court to exercise jurisdiction consistent with due process.[25] The court also noted that it was foreseeable to DSF that harm from its allegedly tortious conduct would be felt by Lyme in New Hampshire. DSF argues that Lyme’s assertion of personal jurisdiction, adopted by the court, is inconsistent with Lyme’s current assertion that DSF’s unfair or deceptive conduct occurred “primarily and substantially in Massachusetts.”
I disagree. It should be noted that “primarily and substantially in Massachusetts” is not a jurisdictional prerequisite to suit; rather, c. 93A, §11, explicitly places the burden of proof on this issue on the defendant to establish an exemption from liability. See Kuwati Danish Computer Co. v. Digital Equip. Co., 438 Mass. at 470. See also Kansallis Finance, Ltd. v. Fern, 40 F.3d 476, 481 (1st Cir. 1994). Thus, Lyme is not obligated to show that DSF’s conduct occurred primarily and substantially in Massachusetts to maintain its c. 93A claim. In any event, such an assertion would not be inconsistent with a prior assertion that DSF’s course of conduct during negotiations, including its alleged misrepresentations, was sufficient for New Hampshire to exercise personal jurisdiction over DSF. The inquiry under c. 93A, §11, which is fact intensive, requires the court to focus on the center of gravity of the circumstances that give rise to the claim, which may include consideration of such factors as where the defendant committed the unfair and deceptive acts, where the plaintiff received or acted on the wrongful conduct, and where the plaintiff sustained a loss caused by the wrongful conduct. Kuwati Danish Computer Co. v. Digital Equip. Co., 438 Mass. at 472-73 and n. 13. Where conduct occurs in more than one jurisdiction, the court may consider the number of wrongful acts in each jurisdiction as well as the significance or impact on the case of individual acts. Id. *422 It is not inequitable, inappropriate or a self-serving contradiction for Lyme to argue that DSF’s conduct during the lengthy negotiations gave rise to sufficient contacts with New Hampshire for the exercise of personal jurisdiction there, and also to argue that the center of gravity of DSF’s unfair or deceptive conduct occurred in Massachusetts for purposes of c. 93A. Accordingly, Lyme is not precluded by the doctrine of judicial estoppel from asserting its c. 93A claim in this action.
DSF next contends that Lyme cannot prevail on Count VI of its counterclaim because c. 93A only prohibits unfair acts and practices in dealings between independent business entities at arm’s length or in competitive mode, and not those that occur within a single entity in a strictly private transaction. It is true that an association between two parties to form a business together, at least when that association ultimately results in an agreement between them, is not the kind of commercial transaction regulated by c. 93A, and the statute will not apply even where some of the alleged unfair conduct occurred prior to the formation of the venture but in the course of its mutual creation. See Szalla v. Locke, 421 Mass. 448, 452 (1995). The Federal courts have applied this principle strictly, holding that by negotiating the terms of a joint venture, a party forfeits c. 93A protection without regard to whether the negotiations culminated in the formation of a joint venture. See Petricca Develop., Ltd. Partnership v. Pioneer Dev. Co., 214 F.3d 216, 224-25 (1st Cir. 2000) (c. 93A did not apply where parties executed option agreement to invest in development of shopping center and memorandum of understanding setting forth basic terms of joint venture, and one party later withdrew from deal and undertook development elsewhere); Smith & Croyie, LLC v. Ridgewood Power Corp., Ill F.Sup.2d 77, 84 (D.Mass. 2000) (c. 93A did not apply where financier and developer signed letter agreement contemplating establishment of joint venture but project fell through).
Nonetheless, where one party’s purported negotiations with another to form a joint venture are a sham intended to gain a personal competitive advantage, c. 93A, §11, may apply. See Goldbaum v. Weiss, 50 Mass.App.Ct. 554, 559 (2000), rev. denied, 433 Mass. 1103 (2001) (c. 93A applied where parties initially contemplated joint venture, plaintiff broke off preliminary negotiations, and defendant then undertook sham negotiations with plaintiff for franchise joint venture in order to interfere with plaintiffs option to operate franchise at certain location). Given Lyme’s allegations that DSF promised a partnership in order to induce Lyme to provide valuable services, while never intending to execute a binding partnership agreement, I conclude that the circumstances of the parties’ negotiations to form a joint venture contained an element of competitiveness sufficient to invoke c. 93A.
The existence of unfair or deceptive acts under c. 93A must be determined from the circumstances of each claim. See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass, at 61. In determining unfairness under §11, the court focuses on the nature of the challenged conduct and on the purpose and effect of that conduct. See Massachusetts Employers Ins. Exchange v. Propac Mass., Inc 420 Mass. 39, 42-43 (1995). However, the boundaries of what may qualify for consideration as a c. 93A violation is a question of law. Davidson v. General Motors Corp., 57 Mass.App.Ct. at 644. It is well established that common-law fraud violates c. 93A, §11, and in certain circumstances a negligent misrepresentation may also violate the statute. See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. at 62. Here, Lyme’s c. 93A claims are primarily based on its allegations of misrepresentation and fraud. Although c. 93A goes far beyond the scope of the common law, where a plaintiffs c. 93A claim is based solely on an underlying claim for common-law fraud which cannot succeed, summary judgment on the c. 93A claim is appropriate. See Macoviak v. Chase Home Mortgage Corp., 40 Mass.App.Ct. 755, 760, rev. denied, 423 Mass. 1109 (1996). DSF argues that because Lyme’s common-law fraud claims have failed for lack of reasonable reliance, its c. 93A claim must also fail. However, reasonable reliance on a misrepresentation is not required to establish a violation of c. 93A as long as the plaintiff proves a causal connection between the misrepresentations and the loss, and that the loss was a foreseeable result of the deception. See International Fidelity Ins. Co. v. Wilson, 387 Mass. 841, 850 (1983). Since I have determined that the record evidence of DSF’s and Solomon’s dealings with Tribeca in relation to the Neceo Building project presents material issues of fact concerning whether Solomon falsely represented an intent to go forward in a partnership or joint venture with Lyme, the absence of reliance will not defeat Lyme’s claims under c. 93A, §11.
DSF further argues that Lyme’s c. 93A claim must fail because Lyme is limited to recovering reliance damages, and those items which Lyme claims as reliance damages do not constitute “money” or “property” within the meaning of the statute. To recover under §11, the plaintiff must show a “loss of money or property, real or personal.” G.L.c. 93A, §11 (2002). “Money” means money, not time, and “property” means the kind of property that is bought or leased, not intangibles such as security, peace of mind, reputation or personal liberty. See Tech Plus, Inc. v. Ansel 59 Mass.App.Ct. 12, 19, rev. denied, 440 Mass. 1108 (2003), quoting Baldassari v. Public Finance Trust, 369 Mass. 33, 45 (1975). Lyme, however, seeks to recover its lost profits from the Neceo Building project, which would clearly satisfy the statutory requirement.
There are two usual measures of damages in cases of fraud. In cases of intentional deceit, the plaintiff typically is entitled to recover the benefit of the bargain, while in cases of negligent misrepresentation, a *423 plaintiff may recover only reliance damages. See Danca v. Taunton Savings Bank, 385 Mass. 1, 8-9 (1982); Anzalone v. Strand, 14 Mass.App.Ct. 45, 48-49 (1982). Here, Lyme argues that its claim of intentional deceit entitles it to recover the benefit it would have received if DSF had executed the Operating Agreement as promised, viz., the profits Lyme would have been entitled to receive from the Neceo Building project. However, the benefit of the bargain rule may be modified where justice requires. See Rice v. Price, 340 Mass. 502, 509 (1960). There is some authority for the proposition that in an action under c. 93A for misrepresentations made in the course of failed contract negotiations, a party may recover reliance damages but not benefit of the bargain damages such as lost profits. See Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. at 416-17, S.C., 412 Mass. at 711 (1992). See also M.H. Promotion Group, Inc. v. Cincinatti Milacron, Inc., 1998 WL52239 (Sup.Ct. Jan. 28, 1998) (Gants, J.) (where defendant failed to execute written lease agreement as promised and there was no binding contract, plaintiffs potential recovery was limited to tort-based claims of promissory estoppel, fraud and c. 93A with reliance damages only). Cf. Goldbaum v. Weiss, 50 Mass.App.Ct. at 559 (in c. 93A claim based on defendant’s fraudulent failure to close on agreement to operate franchise as joint venture, plaintiff entitled to keep lost profit damages, where defendant failed to raise issue of proper measure of damages below). But see Chamberlayne School & Chamberlayne Junior College v. Banker, 30 Mass.App.Ct. 346, 355 (1991) (where defendant intentionally misrepresented its intent to reduce to writing an oral agreement to acquire plaintiffs right of first refusal to purchase certain property and stalled negotiations until it was too late for plaintiff to take any legal advantage of its right of first refusal, it was proper under c. 93A to award benefit of the bargain damages in the amount plaintiff was to receive for sale of option); see also York v. Sullivan, 369 Mass. 157, 165 (1975).
The question of the appropriate measure of damages for Lyme’s c. 93A claims is one that would benefit from further consideration by the parties and the court. A conference to discuss how best to proceed would be appropriate.

ORDER

For the foregoing reasons, the motion for summary judgment of the plaintiff DSF is allowed insofar as it seeks a declaration to the effect that the plaintiff and the defendants never entered into abinding agreement with respect to the development of the Neceo Building, and that the Term Sheet dated August 14, 2001, between these parties is not a binding agreement. The plaintiffs motion for summaiy judgment is also allowed with respect to Counts I through V of the defendants’ counterclaim, as well as Counts I through V of the third-party complaint. The plaintiffs motion for summary judgment is denied as to Count VI of the defendants’ counterclaim and Count VI of the third-party complaint, each of which sets forth a cause of action under G.L.c. 93A.
Counsel for the parties are to contact the clerk of this session to set up a conference to discuss further proceedings in this action.

DSF argues that Lyme failed to comply with Rule 9A(b)(5) and urges the court to treat DSF’s facts as admitted. See Dziamba v. Warner & Stackpole, LLP, 56 Mass.App.Ct. 397, 400-01 (2002). There have been issues on both sides concerning the Rule 9A(b)(5) statements. I decline to treat any facts admitted based on claimed noncompliance with Rule 9A(b)(5).

The agreement further provides that the operating agreement for any such “Newco” would contain a distribution schedule for its members that would allow the member (including Tribeca, if it chose to invest in the opportunity) to receive a larger share of the project profits as the internal rate of return on the project increased. (Brodsky, Little, tab 6, 146-47). A pro forma that Solomon sent to Brodsky in August 2001 estimated an internal rate of return for the Neceo Building project of 41 percent. In Brodsky’s view, if this were the rate of return achieved, it would have allowed Tribeca to receive 35 percent return on its investment in the project.

Solomon stated that if there were a shortfall in the amount of senior debt (identified by Solomon as the acquisition and construction loan) at the time of the property exchange involving the Neceo Building, DSF would be required to provide the shortfall.

Fhe record also contains an affidavit of David Roby. Some of it appears to repeat discussion of topics covered earlier in Roby’s deposition, and I have considered the deposition testimony rather than the affidavit. In addition, to the extent that the affidavit seeks to characterize, as opposed to quote, what Solomon is alleged to have said to Roby, and states conclusions or opinions on the state of mind of Solomon, I have disregarded the affidavit.

“Company” is defined in the draft operating agreement to mean the limited liability company that would be established in accordance with the operating agreement to run and operate the Neceo Building development project.

The 2002 financial statement was published after Solomon had told Lyme there was no deal, and Lyme felt it would be unwise to include the Neceo Building deal, given the uncertainty as to the partnership with DSF.

In addition, Solomon never formed DSF Equity as an entity to enter into the Neceo Building venture with Lyme.

Tribeca sued Solomon and ultimately, the parties settled for $5,375,000. (Ex. 82 to Little Aff.)

In a decision dated June 18, 2004, the New Hampshire court stayed Lyme’s suit against DSF pending resolution of this action.

DSF seeks summaiy judgment on its complaint and on Lyme’s counterclaims, and Solomon, joining forces with DSF, seeks summaiy judgment on all the claims set out in the third-party complaint against him. Since DSF and Solomon have joined in the motion for summaiy judgment and since Lyme’s counterclaims against DSF are identical to its claims against Solomon in the third-party complaint, the following discussion considers only the counterclaims against DSF. It should be understood, however, that the discussion applies with equal force to the parallel claims in the third-party complaint.

Although the parties argue in terms of whether they had entered into a partnership, their relationship is more aptly characterized as a joint venture, in which parties agree to *424 Invest or associate in a single, limited enterprise. In contrast, a partnership is usually formed for the transaction of a general business. See Shain Investment Co., Inc. v. Cohen, 15 Mass.App.Ct. 4, 7 (1982). The distinction is not material to the resolution of this summary judgment motion.

The specific language from Section 11 is the following: “Except for the [confidentiality agreements contained in Term Sheet] . . . neither DSF Investors, Lyme nor any of their respective affiliates has any legally binding obligation in connection with this Term Sheet or the transactions contemplated hereby, and no party mill be legally bound in any manner unless and until, acting in its sole discretion, it executes and delivers definitive and legally binding written agreements. No negotiations, course of conduct or other circumstance shall create any legally binding obligations on the part of the parties hereto or their affiliates with respect to this Term Sheet or the transactions contemplated hereby, and any party may, in its sole discretion and for any reason or no reason, terminate this Term Sheet and all related discussions and negotiations at any time ...” (Emphasis supplied).

The Appeals Court’s decision in Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390 (1991), was reviewed by the Supreme Judicial Court in Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703 (1992). The Supreme Judicial Court agreed with the Appeals Court’s reversal of the trial court’s judgment, but disagreed with some of the Appeals Court’s reasoning. There is no disagreement expressed, however, with the language from the Appeals Court’s decision that is quoted here in the text.

In the course of arguing that there was no effective delivery, Lyme refers to the fact that Solomon “whited out” one of Roby’s handwritten additions to the Term Sheet but does not appear to rely on this “whiting-out” to show that the Term Sheet was not a binding document, perhaps because there is no evidence disputing Solomon’s testimony that he notified Roby of his actions, requested a response if Roby disagreed, and Roby never responded to the invitation to object.

See, e.g., Charles, Henry & Crowley Co. v. Home Ins Co., 349 Mass. 723, 726 (1965); Restatement (Second) of Contracts, §226, comment a (1981).

It is worth noting that in the Massachusetts Municipal Wholesale Electric Co. case, cited by Lyme, the court did not find a condition precedent to have been created, even though the contract language was clearly more “emphatic” than what appears in the Term Sheet at issue here. The contract in that case provided “This Agreement shall be effective upon execution and delivery of Power Sales Agreements by MMWEC and Participants whose Participants’ Shares total 100.0%.” Massachusetts Municipal Wholesale Electric Co. v. Danvers, 411 Mass. 39, 45-47 (1991).

Lyme may be arguing that delivery was necessary because in its absence, Lyme (through Roby) did not appreciate or understand that the Term Sheet was in effect. That argument fails as well. The record shows that the term “Term Sheet” was included and defined in every draft of the Operating Agreement that the parties reviewed and worked on, and that Roby referred to the Term Sheet’s provisions on one or more occasion in his negotiations with Solomon between August 2001 and April 2002, in a manner suggesting he knew it was in effect. Furthermore, once the Term Sheet was executed by the parties, it was in effect, whether or not Roby had subjective knowledge or a subjective belief of this fact.

In this regard, the record shows that Solomon did send the first draft of the Operating Agreement to Roby only one week later, on September 21, 2001.

Even on the assumption that Solomon waived Section 11 of the Term Sheet, Lyme has no reasonable expectation of proving its claim that the parties entered into a binding oral partnership in or before January or February of 2002. As previously indicated, the question of whether there is a partnership is one of intent. See Fenton v. Bryan, 33 Mass.App.Ct. 688, 691 (1992); John Alden Transp. Co., Inc., 11 Mass.App.Ct. 920, 921 (1981). Lyme emphasizes Solomon’s statements that DSF and Lyme were partners, were going forward, and were going to make a ton of money. Although one person’s statement to another that they are partners is relevant as tending to prove such, it is only one piece of evidence to be considered. See Van Dyke v. Bixby, 388 Mass. 663, 668 (1985). To create an enforceable contract, there must be agreement between the parties on the material terms of the contract. Situation Management Systems, Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000). Failure of the parties to agree on material terms prevents any rights or obligations from arising on either side. See Rosenfield v. United States Trust Co., 290 Mass. 210, 216 (1935) (parties had engaged in only imperfect negotiations, despite one side’s statements that “that is all settled” and “the deal was closed”). Here, it is apparent that there was no meeting of the minds sufficient to create a binding oral partnership with respect to the Neceo Building project. Although Solomon expressed his view at the end of January of 2002 that the parties had resolved the last outstanding issue, when he sent Lyme the February draft reflecting the purported agreement, Roby marked up the draft and made a number of substantive changes, including altering the terms of the default loan from no recourse against DSF to-full recourse. Thus, the undisputed evidence shows that DSF and Lyme had not reached a meeting of the minds on all material terms of the venture in January of 2002. Compare Loft v. Lapidas, 936 F.2d 633, 636 (1st Cir. 1991) (partnership formed where parties orally agreed to every essential point of the partnership relationship and only step left was to execute a formal document).
In light of this conclusion, I do not need to address in detail DSF’s argument that any partnership agreement would be barred by the statute of frauds. Joint venture contracts for the division of profits and losses from transactions in land are generally not held to be within the statute of frauds, even though the contract requires one party to purchase or sell land for the parties’ mutual benefit, so long as the party suing does not assert a property interest in the land at issue. See First Pennsylvania Mortgage Trust v. Dorchester Sav. Bank, 395 Mass. 614, 625 (1985); Fencer v. Wills, 259 Mass. 546, 549-50 (1927); Greenfield v. Pearlstein, 1995 Mass.App.Div. 30, 31.

Moreover, the alleged promise that DSF and Lyme were partners is simply too vague to be enforced, given that the parties had not yet negotiated the myriad details of the complex Neceo Building venture. See Pappas Indust Parks, Inc. v. Psarros, 24 Mass.App.Ct. 596, 599, rev. denied, 400 Mass. 1107 (1987) (oral promise to sell land was not enforceable by estoppel where negotiations were incohoate, significant details remained unresolved, and draft agreement was unsigned).

The question of whether a party’s reliance on another’s promise is reasonable is often a question of fact, but in an appropriate case can present an issue of law, particularly where the parties are of equal knowledge and sophistication. See Cataldo Ambulance Service, Inc. v. Chelsea 426 Mass. 383, 387 (1998).

See discussion on p. 30 above.

See Kuwait Danish Computer Co. v. Digital Equip. Co., 438 Mass, at 470.

See Lyme Timber Company v. DSF Investors, LLC, No. 02-E-190 (Grafton Sup.Ct. March 20, 2003), aff'd, (N.H. Feb. 17, 2004).